KATE TOOTLE, W. W. WHEELER, JOSHUA MOTTER AND FRANCES S. DAMERON, *as partners under the firm name of Tootle, Wheeler & Motter,* v. D. C. KENT, ELLA F. BRADY AND W. J. McPHEE.

(Filed June 9, 1903.)

1. ACTION—Rights, Legal and Equitable, may be Merged. Under our code of civil procedure, all of the rights of the parties, both legal and equitable, so far as they are consistent with one and another, and affect the same parties, may be united in one action and merged in a single judgment.

2. SAME—Single Cannot be Divided. A single and entire cause of action cannot be divided into several claims, and separate actions maintained thereon.

3. SAME—Rule Applied. There are two causes of action stated in the petition; (1) an equitable cause which seeks to dissolve the partnership and secure an accounting, the appointment of a receiver to conserve the partnership property, and that the court distribute the same according to right and justice; and the other is a legal cause of action, in which the plaintiff seeks to recover damages for depreciation of the value of the stock of goods, for loss of profits by reason of the closing of plaintiff's business, and for the destruction and impairment of plaintiff's financial standing, resulting from the wrongful, fraudulent and malicious acts of the defendants, and their authorized agents. And these two causes of action may be united in the same petition, for the reason that both arise out of the same transaction or transactions connected with the subject of the action.

4. SAME—Damage to Business, Cause of. In an action by a merchant to recover damages for the wrongful and malicious acts of another, he is entitled to recover for the depreciation in the value of the property, and the loss he has sustained by reason of the closing of his store and the suspension of his business.

5. DAMAGES—Loss of Profits an Element. Where the reasonable and probable loss of profits can be ascertained as the direct and proximate cause of the closing of the merchant's store by virtue

Tootle *et al.* v. Kent *et al.*

of a wrongful and fraudulent chattel mortgage, he is entitled to recover as an element of damages the probable loss of profits sustained by him during the time that the store was closed, and the business was suspended.

6. SAME—Must be Actual to Entitle Recovery. The plaintiff in this case is entitled to recover as an element of actual damages any loss that he has sustained to his financial standing and credit as the direct and proximate cause of the wrongful and fraudulent acts of the defendants or their authorized agents; but he is not entitled to recover for remote, speculative or conjectural damages.

7. SAME—Testimony Must Show What. The court permitted the plaintiff to testify as to the amount of damages he sustained to the stock of goods, over the objections of the defendants. This method of proving damages was erroneous. The witness should have been required to state the facts, and not his conclusions as to the amount of damages sustained.

8. SAME—Measure of. The measure of plaintiff's damages for loss of goods, or depreciation in value, is the difference between the market value of the goods at the time they were taken possession of under the chattel mortgage by the defendants, and its value at the time the property was placed in the hands of the receiver.

9. RECEIVER—Appointment of Does not Abate Accrued Rights and Remedies. The rights and remedies of the plaintiff which had accrued at the time of the commencement of the action did not abate with the appointment of the receiver. But upon the appointment of the receiver, the entire legal and equitable title to the property of the firm as well as its rights and remedies vest in him.

10. SAME—Damage to Property After Appointment Not Recoverable in Action Pending. Any damage done to the property of the plaintiff, or any loss of profits while the same was in the hands of a receiver, could not be recovered in this action.

11. INSTRUCTION—Erroneous, When. Instructions two and three given by the court at the request of plaintiff were erroneous and misleading, for the reason that they did not state the true measure of damages. Instruction ten given by the court is subject to the same objection.

12. TRIAL, PLACE OF—Territorial Statute Upheld. Section 56 of the code of civil procedure, which provides, among other things, that "the court may, on application of either party, change the place of trial to some county where such objection does not exist," is not in conflict with the provisions of section 3, chapter 5 of the act of congress approved December 21, 1898, which authorized the su-

preme court or chief justice to designate any judge to try a particular case or cases in any district, when the judge of said district has been counsel in the cause, and is therefore valid.

(Syllabus by the Court.)

*Error from the District Court of Oklahoma County; before John H. Burford, Trial Judge.*

*John W. Shartel, Brown & Dolman* and *Asp & Cottingham,* for plaintiffs in error.

*J. R. Keaton, R. G. Hays, Selwyn Douglas* and *MacGregor Douglas,* for defendant in error, D. C. Kent.

### STATEMENT OF FACTS.

The facts upon which this action is based are substantially as follows: On October 9, 1897, D. C. Kent, plaintiff in the court below, Ella F. Brady and J. W. McPhee, defendants in the court below, entered into a co-partnership agreement for the purpose of carrying on and conducting a retail merchandise business in Oklahoma City, Oklahoma, under the firm name and style of D. C. Kent & Co. It appears that Kent put into the partnership business a stock of general merchandise, of which he was the owner, and which was valued at $8,000. Brady and McPhee each agreed to contribute the sum of $500 to the firm business, and to pay Kent 7 per cent interest on $4,000 of the sum contributed by him. It was further agreed that Kent and McPhee were each to give their time and attention to the business of the firm, and were each to receive a salary of $75 per month. Kent was to be the owner of sixteen-eighteenths of the property of the co-partnership, and Brady and McPhee were each to be the owner of one-eighteenth of the partnership business. The profits were to

be divided one half to Kent and one-fourth each to Brady and
McPhee.

Pursuant to this agreement, the firm rented a store-room,
opened up a stock of goods for sale, employed clerks, purchas-
ed goods and carried on the business for several weeks. . The
capital of $1,000 that was to be contributed to the firm by
Brady and McPhee was, by the consent of all parties,'to be
paid. into the firm by Brady and McPhee to secure merchan-
dise from the firm of Tootle, Wheeler & Motter, of St. Joseph,
Missouri, to the amount and value of $1,000, this sum to be
charged by Tootle, Wheeler & Motter to W. C. Brady, the hus-
band of the defendant, Ella F. Brady, and who was a travel-
ing salesman for Tootle, Wheeler & Motter. The said W. C.
Brady agreed to this arrangement, and informed Kent and
McPhee that he had perfected arrangements for securing
credit for the firm of D. C. Kent & Co., of $1,000, and that
Tootle, Wheeler & Motter had charged the same to his individ-
ual account. It appeared, however, that no such credit, had, in
fact been obtained until after the firm of D. C. Kent & Co.
had their place of busines closed.

It further appears that in the latter part of November,
1897, and after the firm of D. C. Kent & Co. had been in bus-
iness only a few weeks, the partners disagreed in regard to
some matter connected with the business, and were unable
to agree upon a dissolution of the co-partnership, or a satis-
factory disposition of the property of the firm. It appears
that at this time the firm was in debt about $4,000, but none
of which was due. That the firm had a stock of merchandise
at the time estimated to be of the value of $12,000, and about
$500 in cash. The firm was entirely solvent, and none of

their creditors were pressing them for the payment of any of their outstanding debts. The firm was indebted to Tootle, Wheeler & Motter about $3,600, but this amount was not yet due. W. C. Brady, husband of Ella F. Brady, and who, it appears, was the real owner of the interests represented by his wife, Ella F. Brady, and McPhee, notified Kent that he would no longer continue the partnership business. It further appears that after giving such notice to Kent, W. C. Brady wired the firm of Tootle, Wheeler & Motter, St. Joseph, Missouri, and requested them to authorize him to take a chattel mortgage from D. C. Kent & Co. upon the entire stock of merchandise, for the payment of their claim. Tootle, Wheeler & Motter, in response, wired Brady to take mortgage and secure their claim.

It further appears that Brady then employed the firm of McConnell & Chambers, as attorneys for Tootle, Wheeler & Motter, and procured his wife, Ella F. Brady, and W. J. McPhee, to execute a note in the firm name of D. C. Kent & Co., payable to the firm of Tootle, Wheeler & Motter, for the sum of $3,646, and also had a chattel mortgage executed on the entire stock of goods and merchandise of D. C. Kent & Co., both of which were payable on demand, aftere date, and, were executed without the knowledge or consent of D. C. Kent, during the time that he was in the city, while absent from the store room at the noon hour.

It further appears that as soon as the note and mortgage were executed, the possession of the entire stock of goods and merchandise was turned over to McConnell, and this was done without even the knowledge or consent of D. C. Kent. McConnell immediately took possession of the stock of goods,

closed the store and had posted on the door of the store, and at other places, in the name of Tootle, Wheeler & Motter, a notice of the foreclosure of the mortgage, and sale of the stock of goods at the expiration of ten days.

It further appears that on the evening of the same day McPhee and McConnell, (as an evidence of good faith we presume,) procured a locksmith to break and open the money drawer in the safe, to which Kent had the only key, and took therefrom $200 in cash, which was turned over to McConnell and receipted for, together with other sums found in the money drawer, in the name of Tootle, Wheeler & Motter.

On December 4, 1897, D. C. Kent commenced a civil action in the district court of Oklahoma County against the defendants Ella F. Brady and W. J. McPhee and Tootle, Wheeler & Motter, for the dissolution of the partnership, and for an accounting, and for the purpose of winding up the partnership business; that a receiver be appointed to take charge of the partnership property, and that Tootle, Wheeler & Motter be enjoined from foreclosing their chattel mortgage, and that he recover general and special damages, by reason of the wrongful, fraudulent and malicious acts of the defendants.

On December 4, 1897, the same day that the case was commenced, upon application of the plaintiff, and due notice to the attorneys of the defendants, a receiver was appointed by the Honorable J. R. Keaton, then presiding judge of the Third judicial district, and a temporary injunction was granted, restraining Tootle, Wheeler & Motter from foreclosing their chattel mortgage in any other way except by suit in the district court of said county and territory.

The receiver immediately qualified, and took charge of the entire stock of goods and merchandise. The defendants interposed a demurrer to the petition on the ground that there was a defect of parties; that there was a misjoinder of causes of action; that plaintiff had no legal capacity to sue for damages against the defendants; and that plaintiff failed to state facts sufficient to constitute a cause of action against the defendants.

The demurrer was overruled, and the defendants filed an answer, in which they admitted the partnership and the execution of the note and chattel mortgage, as alleged in the plaintiff's petition, and denied all other material allegations in the petition.

Upon the issue of damages the cause was submitted to the jury, and a verdict returned in favor of the plaintiff and against the defendants for $10,000. A motion for a new trial was duly filed and overruled.

The defendants Tootle, Wheeler & Motter bring this case here on appeal. Since Ella F. Brady and J. W. McPhee, defendants in the court below, failed to prosecute an appeal they have been made defendants in error in this court by plaintiffs in error, Tootle, Wheeler & Motter.

Since this cause has been appealed and submitted in this court, D. C. Kent has died, and the cause has been revived in the name of the legal heirs and representatives. Reversed and remanded.

Opinion of the court by

HAINER, J.: The first question to be considered arises on the pleadings. The defendants in the court below de-

murred to the petition, alleging as one of the grounds therefor that several causes of action were improperly joined. The court overruled the demurrer, and it is contended by plaintiff in error that this was error. In our opinion, this objection is not well founded. Under our code of civil procedure, legal and equitable causes of action may be united in the same petition, where they arise out of the same transaction or transactions connected with the subject of the action, or for injuries, with or without force, to person and property, or either. There are two causes of action stated in the petition. One an equitable cause, which seeks to dissolve the partnership, secure an accounting, and asks that a receiver be appointed to conserve the partnership property, and that the court distribute the same according to right and justice. The other is a legal cause of action, in which the plaintiff seeks to recover damages for depreciation in the value of the stock of goods for loss of profits by reason of closing up of the plaintiff's business, and for the destruction and impairment of plaintiff's financial standing and credit, resulting from the wrongful, fraudulent and malicious acts of the defendants and their authorized agents. This cause of action is analogous to an action on the case at common law for wrongful and malicious attachment. These two causes of action arise out of the same transactions, and are connected with the same subject of action.

The plaintiff seeks two reliefs, one equitable, and the other legal. They are not inconsistent or repugnant. There is only the union of different remedial rights, springing from one cause of action, and therefore there is no joinder of different causes of action.

In *Akin v. Davis,* 11 Kan. 580, it was held that where a person builds a dam and thereby causes a stream of water to rise so as to overflow another's land to his damage, such person has at least two causes of action, first, a legal cause of action for the injuries already caused by the dam; second, an equitable cause of action to restrain by injunction, the further maintainance and continuance of the dam. And these two causes of action may be united in the same petition, for both arise out of the same transaction or transactions connected with the same subject of action.

In *Scarborough v. Smith,* 18 Kan. 399, it was held that the following causes of action may be united in the same action, to-wit: A cause of action for the recovery of real property; a cause of action for the value of the rents and profits of such real property; and a cause of action for the partition of said real property.

In *Henry v. McKittrick,* 22 Pac. 578, the supreme court of Kansas, in discussing this question, used the following language:

"The fact that equitable actions may be tried before a court, while actions of a legal character must be tried before a jury, unless a jury is waived, is no sufficient objection to this mode of procedure. (Pom. Rem. sec. 86) In any case all the issues of fact made by the pleadings, whether legal or equitable, or both, may be submitted to a jury for trial, and the jury may find generally or specially upon all such issues; or the case, as an equitable case, or so much of it as is equitable, may be tried before the court without a jury, and the court may determine whether equitable relief can be adjudged or not, and what equitable relief. After the court has disposed of the case, so far as it is equitable,

it may then submit the remainder of the case, if there is any remainder, to a jury."

In *Hahl v. Sugo,* 169 N. Y. 109, 62 N. E. 185, the court of appeals of New York held that under the code of procedure all of the rights of litigants, both legal and equitable, so far as they are consistent with one another and affect the same parties, can be tried in one action, and merged in a single judgment, and that a single and entire cause of action cannot be divided into several claims and separate actions maintained thereon.

Pomeroy in his work on Equity Jurisprudence, sec. 183, in applying this principle, enunciates the following rule:

"Whenever a plaintiff is clothed with primary rights, both legal and equitable, growing out of the same transaction or condition of facts which thus constituted a cause of action, and is entitled thereon to an equitable remedy, and also to a further legal remedy based upon the supposition that the equitable relief is granted, and he sets forth all these facts in his petition, and demands a judgment awarding both species of relief, the action will be sustained; the court will, in its judgment, formally grant both the equitable and the legal relief. In these cases there is, properly considered, no joinder of different causes of action; there is only the union of different remedial rights flowing from one cause of action."

The fact that a receiver was appointed on application of the plaintiff to take charge of the partnership property was merely ancillary to the main action; it could not defeat plaintiff's right to maintain this action, nor could it prejudicially affect any right of plaintiffs in error.

But a more serious question confronts us in the consideration of the admissibility of evidence in regard to the

depreciation of the value of the stock of goods, the loss of profits, and the destruction or impairment of the plaintiff's financial standing and credit. A great deal of incompetent and immaterial testimony was introduced by the plaintiff over the objections of the defendants, which, in our opinion, was highly prejudicial to the rights of the defendants, and should have been excluded by the court.

It appears from the evidence that the store was closed from the 29th day of November, 1897, until December 6, 1897, when the receiver took charge of the property. It was competent for the plaintiff to prove any injury that was done to the stock of goods, or that they depreciated in value from the time the defendants, Tootle, Wheeler & Motter, took possession of the stock under the chattel mortgage on the 29th of November, 1897, until the receiver took possession of the same. On this point the court permitted counsel for the plaintiff to propound to the witness, D. C. Kent, the following question:

"What was the amount of damage done to the goods by the change in the condition in which they were when the store was closed when you last saw them and when you again saw them on the 6th of December, 1897?"

To this question the defendants objected as incompetent, as calling for a conclusion of the witness, and invading the province of the jury. The objection was overruled and an exception reserved. To this question the witness answered as follows:

"I hardly know that I would be able to state the amount of damage. It would perhaps be several hundred dollars."

Several questions along this line were put to the witness Kent, over the objections of defendant's counsel, and he was permitted to state his conclusions as to the damage that he claimed he had sustained to the stock of goods.

This method of proving damages was clearly erroneous. The witness should have been required to state the facts, and not his conclusions as to the amount of damages he had sustained. He should have been permitted to state the condition, quality and value of the goods; if any of the goods were destroyed or injured in any respect, that should have been shown. The witness should have been permitted to testify as to the market value of the goods, if he knew, immediately prior to the time the store was closed under the chattel mortgage, and the market value of the goods at the time they were placed in the custody of the receiver. The jury should have been allowed to draw the conclusion from these facts as to the amount of damages that the plaintiff had sustained in that respect. The measure of the plaintiff's damages for loss of goods or for depreciation in value, being the difference between the market value of the goods at the time they were taken possession of under the chattel mortgage by the defendants, and the value of the property at the time it was placed in the hands of the receiver.

Is the loss of profits a proper element of damages, and recoverable in this case? The authorities upon this point are very conflicting. In some jurisdictions it is held that such damages are not allowable, on the theory that they are remote, speculative and conjectural. We are, however, of the opinion that the more just and reasonable rule is that where the probable loss of profits can be ascertained as the direct

and proximate cause of the closing of a merchant's business by virtue of a chattel mortgage foreclosure, that he should be allowed to recover the probable loss of profits sustained by him during the time that the store is closed and the business is suspended. In our opinion, loss of profits is a result that may be reasonably and approximately ascertained from the closing of a merchant's place of business and the seizure of his stock of goods. In this case, we think he is entitled to recover the reasonable, probable loss of profits from the time that the store was closed, until the goods were placed in the hands of the receiver. The plaintiff would not be entitled to recover for probable loss of profits after the receiver had taken possession of the goods. The evidence, therefore, for the plaintiff should have been confined to that period, and it was error for the court not to limit the testimony in that respect. It was proper for the court to permit the plaintiff to show the amount of the sales and the net profits made by the plaintiff up to the time that his store was closed, and for a reasonable period prior to that time, and the general condition of trade and business during the period the business was suspended on account of the seizure of his goods, as a basis for estimating the reasonable, probable loss of profits.

In *Kidd v. Cook,* 56 Neb. 71, it was held that loss of profits reasonably, naturally and ordinarily expected to follow the closing up of a merchant's place of business, may be recovered in an action for wrongful attachment of all his goods.

In the case of *Allison v. Chandler,* 11 Mich. 548, it was held that generally in an action purely of tort where the amount of profits lost by the injury can be shown with reasonable certainty, lost profits are not only admissible in evi-

dence, but constitute to such extent a safe measure of damages.

In volume 8, page 625, of the American and English Encyclopaedia of Law, (second edition), the rule is thus stated:

"Where the natural and direct result of a tort is the interruption of or an injury to an established business, there may be a recovery of profits lost during the period of enforced suspension or by reason of the tortious act."

Shinn, in his work on Attachment, section 379, lays down the following rule:

"The plaintiff may recover full compensation for loss of credit, breaking up of business, loss of customers, and prospective profits, and injuries to his reputation resulting from a wrongful and malicious attachment."

This rule, in our opinion, is applicable to the case under consideration.

The rights and remedies of the plaintiff which had accrued at the time of the commencement of the action did not abate with the appointment of the receiver. But upon the appointment of the receiver, the entire legal and equitable title to the property of the firm, as well as its rights and remedies, vested in him. (Beach on Receivers, sec. 584.)

It follows that any damage done to the property, or any depreciation in its value, or any loss of profits while the same was in the hands of the receiver, could not be recovered by the plaintiff in this action.

The jury in their special verdict, allowed the plaintiff for his measure of loss of profits that would have been real-

ized by the firm of D. C. Kent & Co. $2,105. This was clearly excessive, as the business was suspended for a period of only seven days, and the maximum profits for any day prior to the closing of the store was $30. Taking this, then as a basis, the jury could not possibly have returned a verdict for more than $210, as the aggregate profits for that period.

But is the loss of credit a proper element of damage in this case? It is earnestly contended by counsel for plaintiffs in error that it is not a proper element of damages, because it is too remote and speculative. We cannot assent to this doctrine. It seems to us that it would be a monstrous doctrine to hold that a merchant whose financial standing and credit has been exceptionally good during a course of years, who had established a good business reputation for honesty and probity, and that by the wrongful, fraudulent and malicious conduct of another his financial standing and credit could be destroyed or seriously impaired, his entire stock of goods seized under a fraudulent and void mortgage, his store closed, his business wrecked and his reputation ruined; and for all these wrongs the law would afford no redress.

Such is not the true and sound doctrine. But the damages he is entitled to recover for loss of credit must be the direct and proximate result of the injury sustained by him. He is not entitled to recover for remote, speculative, uncertain or conjectural damages.

In *Kidd v. Cook, supra,* it was held that for the loss of financial credit and standing through the wrongful act of another, a merchant may recover whatever pecuniary damages he can prove he has sustained thereby. The supreme court of Nebraska, in discussing this question, said:

"Another argument is, that loss of credit was not a proper element of Cook's damages; that this element was too remote and speculative for consideration. This is simply saying that the wrongful destruction or injury of a merchant's credit is one for which the law affords no redress. We cannot subscribe to this doctrine. A man's financial standing or credit may not be 'property,' within the technical meaning of that term, but it is something often more valuable, and if it be wrongfully injured or destroyed by another, he may recover whatever pecuniary damages he can prove, by competent testimony under proper pleadings, he has sustained thereby. (*Meyer v. Fagan,* 34 Neb. 185; *Lewis v. Taylor,* [Tex. Civ. App. Nov. 29, 1893] 24 S. W. 92; *Hangen v. Hachemeister,* 114 N. Y. 566, 11 Am. St. Rep. 691; *Haverly v. Elliott,* 39 Neb. 201.")

In *Kennedy v. Meacham,* 18 Fed. Rep. 313, Judge Hammond, in charging the jury in a case involving this question, used the following language:

"* * * The plaintiff may also recover such other sum as will compensate him for any injury done to his credit, by which the law does not mean only a credit based on solvency as shown by the relative comparison of debts and assets to meet them. A merchant who owns property in excess of his debts, who has abundant assets and small debts, may enjoy mercantile credit and usually does, if besides he has integrity of character, business capacity, and that sense of obligation which causes him to scrupulously protect his credit by prompt payment of his debts and honest dealings in his business. The relative amount of debts and assets is undoubtedly an important element in estimating the extent or value of any merchant's credit, and cannot be overlooked by you in determining the injury that has been alleged to have been the result of the wrongful suing out of the attachment. But the law does not confine its protection in this respect to a credit based on

property in hand, or available to secure that credit. It extends also to that credit which is based on integrity and business capacity, and the trusting confidence which relies on them. Be it great or small, no one has any right to injure it without liability to pay damages that will compensate for the injury. The value of such credit, and indeed all credit, varies according to the circumstances in the case. Therefore, proof in this case has been admitted to show fully all the circumstances surrounding the plaintiff at the time of the suing out of this attachment, in order that you may be enabled to determine what his credit was founded on, its extent and value and the injury there has been, if any, to it by the suing out of the attachment. The plaintiff is not entitled to damages based on any speculative estimate of his injury, but only to such actual loss of credit as he has sustained from the wrongful attachment, and which was the direct and natural consequence of that wrongful act."

Section 2637 of the Statutes of 1893 is as follows:

"For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this chapter, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

And section 2617 of our Statutes of 1893, lays down the following rule as to exemplary or punitive damages:

"In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example, and by way of punishing the defendant."

In *Seattle Crockery Co. v. Haley,* 33 Pac. 650, the supreme court of Colorado lays down the following rule:

"The general doctrine of the law is that remote, speculative and uncertain damages cannot be recovered for; and injury to credit must necessarily be of the most uncertain value, even when its ascertainment is guarded by the most careful instructions a court can possibly give."

In *City of Memphis v. Brown,* 20 Wallace, 289, the supreme court of the United States held that in an action on a breach of contract, the only damages allowable are those which are capable of legal computation and damages which are shadowy, uncertain and speculative are not recoverable.

In *Howard v. Stillwell & Bierce Mfg. Co.* 139 U. S. 199, Mr. Justice Lamar, speaking for the court, in discussing the question as to what constitutes the true measure of damages for loss of profits, says:

"The grounds upon which the general rule of excluding profits, in estimating damages, rests, are (1) That in the greater number of cases such expected profits are too dependent upon numerous, uncertain and changing contingencies to constitute a definite and trustworthy measure of actual damages; (2) because such loss of profits is ordinarily remote and not, as a matter of course, the direct and immediate result of the non-fulfillment of the contract; (3) and because most frequently the engagement to pay such loss of profits, in case of default in the performance, is not a part of the contract itself, nor can it be implied from its nature and terms. (Sedgewick on Damages, 7th ed. vol. 1, p. 108; *The Schooner Lively,* 1 Gallison, 315, 325 per Mr. Justice Story; *The Anna Maria,* 2 Wheat. 327; *The Amiable Nancy,* 3 Wheat. 546; *La Amistad de Rues,* 5 Wheat, 385; *Smith v. Condry,* 1 How. 28; *Parish v. United States,* 100 U. S. 500, 507; *Bulkely v. United States,* 19 Wall. 37) But it is equally well settled that the profits which would have been realized had the contract been performed, and which have been prevented by its breach

are included in the damages to be recovered in every case where such profits are not open to the objection of uncertainty or of remoteness, or where from the express or implied terms of the contract itself, or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into. (*United States v. Behan,* 110 U. S. 338, 345, 346, 347; *Western Union Tel. Co. v. Hall,* 124 U. S. 444, 454, 456; *Philadelphia, Wilmington & Baltimore Railroad Co. v. Howard,* 13 How. 307.)"

It follows that the measure of Kent's actual damages was all the loss he had sustained as a result of the wrongful acts of the defendants and their authorized agents. If the stock of goods when turned over to the receiver were worth less than they were when taken under the chattel mortgage, the amount of that depreciation was the proper measure of damages. If on account of the closing of his store, his business was entirely suspended, he was deprived of profits which he would have made had the business been permitted to go on, the loss of profits during that period was another element of his damages; and if his reputation and credit as a merchant was destroyed or impaired by the wrongful acts of the defendants, or their agents, the injury was another element of his damages.

It is contended that the court committed error in charging the jury in this case. It is claimed that instructions two and three given by the court at the request of the plaintiff were erroneous and misleading, in not fixing the true measure of damages. Instruction No. 2 reads as follows:

"The jury are instructed that in determining the amount of damages you should allow, if any, you are called upon to

exercise your judgment upon the evidence in the case, and to exercise your common sense and common observation and experience in the affairs of life, and from all the evidence in the case to draw a reasonable and safe conclusion; and that, in considering the evidence upon the loss to the plaintiff by reason of the deterioration of the value of his property and business, the loss to his financial standing and credit as a merchant and the amount of probable profits which would have accrued to him but for the acts of the defendants, if you find such acts to have been wrongful, the measure of damages to the plaintiff must be left to your sound discretion and good judgment, uninfluenced by bias or prejudice and uncontrolled by mere conjecture; and that the time during which it is permissible to consider the probable loss of future profits by reason of the injury to the plaintiff's business and financial standing and credit must be determined in this case according to your best judgment under all of the circumstances in evidence, and upon your own common knowledge and sense of justice; and that the rule which should govern the assessment of damages, as to the length of time during which the plaintiff has and will in the future suffer injury from said acts of the defendants, is such length of time as you can feel that acting under your oaths and obligations you have assumed and from the evidence, you can say would be reasonably safe and prudent."

And instruction No. 3 is as follows:

"The jury are instructed that the inability, if there be any, to compute with accuracy the amount of damages, if there be any, to the plaintiff, by reason of the injury to his business credit and financial standing, or deterioration in value of his property, is no reason why all of these facts should not be considered by the jury as the best evidence obtainable upon which to base their verdict; and that, if you find that the injury to the plaintiff was accomplished through malice, or said acts of defendants amounted to oppression, fraud or mal-

ice, actual or presumed, the jury, in addition to the actual damages, may give other and further damages for the sake of example or by way of punishing the defendants, as the jury shall deem just and proper; and that in such case the jury are instructed that the defendants guilty of such oppression, fraud or malice, must bear the risk, if there be any, in reaching an exact result in the computation of actual damages or in the reasonable assessment of exemplary damages, because, in such case, it is not the plaintiff's fault that the inquiry as to damages has become necessary."

We are constrained to believe that the contention of plaintiffs in error on this point is well taken. These two instructions, in our opinion, are erroneous and misleading. They mis-state the rule as to the true measure of damages. The latter portion of instruction two, which reads as follows, is especially objectionable:

"And that the rule which should govern the assessment of damages as to the length of time during which the plaintiff has and will in the future suffer injury from said acts of the defendants, is such length of time as you can feel that acting under your oaths and the obligations you have assumed, and from the evidence you can say would be reasonably safe and prudent."

In this case there are four elements of damages that may be considered by the jury. The elements of actual damages are as follows: (1) Depreciation in value of the stock of goods; (2) loss of probable profits; (3) loss of financial standing and credit; and (4) if malice is shown, exemplary or punitive damages.

The court should have instructed the jury that the measure of damages for the deterioration in the value of the property was the difference between the reasonable market value

of the stock of goods at the time it was taken under the chattel mortgage by Tootle, Wheeler & Motter, and the market value of the same goods at the time they were taken possession of by the receiver.

The court should have charged on the question of the probable profits, that the measure of damages was the loss of probable profits from the time that Tootle, Wheeler & Motter took charge of the goods under the chattel mortgage, until they passed into the hands of the receiver. And the jury should have been further instructed that the plaintiff could not recover for deterioration in the value of the goods, or for probable profits, while the stock of goods was in the hands of the receiver.

The jury should have been further instructed that the plaintiff could not recover for damages to financial standing and credit for any remote, speculative or conjectural damages; that the only damages that could be recovered in that respect, were for the direct and proximate result of the wrongful acts and conduct of the defendants, or their authorized agents. Instruction 10 given by the court is subject to the same objection.

One more question remains for our consideration and that is: Did the court err in refusing to grant the application for a change of venue? It appears from the record that application was made in due form, for a change of venue from the district court of Oklahoma county, upon the ground that the regular presiding judge, the Honorable B. F. Burwell, was counsel for the plaintiff in the case prior to his appointment as associate justice of the supreme court, and therefore was disqualified to try the case. Judge Burwell, in passing upon

the application for a change of venue, made the following order, which appears in the record:

"Now on this 17th day of February, 1900, is presented to the court, the same being at this time presided over by the Hon. B. F. Burwell, the regular judge of this court, the separate application of the defendants for a change of venue upon the ground that the regular presiding judge of this court, having been of record in this cause as attorney for the plaintiff, the court at this time, by reason of the Hon. J. H. Burford, chief justice of the supreme court of the Territory of Oklahoma, having been assigned to hold a part of this term, commencing on February 20, 1900, for the purpose of trying such cases as the regular judge of this court may be disqualified to try, and by reason of the regular judge of this court having been of counsel in said cause, the court at this time refuses to consider, and this being one of the cases contemplated by said order, pass upon the said motions for a change of venue, and directs that the same be presented to the court as presided over by the chief justice of the supreme court of said territory, to which action of the court at this time in refusing to consider said applications, the said defendants and each of them duly excepted and except.

"(Signed,) B. F. BURWELL, Judge."

The following is the order designating and assigning Judge Burford to preside over the district court of Oklahoma county:

"*In re.* Assignment of judge for Third judicial district, and February term of district court, Oklahoma county:

"Whereas, it has been made to appear to me as chief justice of the supreme court of the Territory of Oklahoma, that Hon. B. F. Burwell, presiding judge of the Third judicial district is disqualified to hear certain causes now pending in the district court of Oklahoma county, and that by reason of his

assignment to preside in the district court of Lincoln county in the First judicial district during a portion of the February, 1900, term thereof, he will necessarily be absent from his district.

"It is hereby ordered that John H. Burford, presiding judge of the First judicial district, be and he is hereby designated for and assigned to the district court of Oklahoma county, to preside over said court, and determine all causes and matters in which the Hon. B. F. Burwell is disqualified to sit as presiding judge, and during the absence of said regular judge from said district, to hold the district court in said district and in Oklahoma county, and to hear, try and determine all causes and matters which may come before said court, or the judge thereof, for hearing or determination, as fully as the regular presiding judge might do if personally present, and presiding in said district.

"Done in chambers at the city of Guthrie, on this 15th day of February, A. D., 1900.

"JOHN H. BURFORD, Chief Justice."

On the 21st of February, 1900, the following order was made in the district court of Oklahoma county, omitting the title.

"Now on this 21st day of February, A. D., 1900, is presented to the court, presided over by the Honorable John H. Burford, chief justice of said territory, the applications of the defendants and each of them, for a change of venue in this cause on account of the disqualification of the regular judge of this court, the Honorable B. F. Burwell, to try said cause, by reason of having been of counsel in said cause, the said motions are duly argued and submitted to the court, after hearing the argument of counsel and being duly advised in the premises, overrules said motions, and each of them, to which ruling the said defendants, and each of them, duly excepted and except.

"(Signed.) JNO. H. BURFORD, Judge."

Section 10 of the organic act of this territory, among other things provides as follows:

"But any case, civil or criminal may be removed, by change of venue, to another county."

It will thus be seen that the organic act, which is the fundamental law of this territory, provides for the removal of a cause on change of venue to another county, in civil, as well as in criminal, cases. For the purpose of carrying into effect this provision of the organic act, the legislative assembly of this territory, in 1893, enacted the following law::

"In all cases in which it shall be made to appear to the court that a fair and impartial trial cannot be had in the county where the suit is pending, or when the judge is interested or has been of counsel in the case or the subject-matter thereof, or is related to either of the parties, or is otherwise disqualified to sit, the court may, on application of either party, change the place of trial to some county where such objection does not exist." (Code Civil Procedure, Sec. 56.)

On December 21, 1893, the congress of the United States passed an act entitled: "An Act to Provide for Two Additional Associate Justices of the Supreme Court of the Territory of Oklahoma, and for Other Purposes." In this act it was provided:

"The supreme court of said territory, or the chief justice thereof, may designate any judge to try a particular case or cases in any district when the judge of said district has been of counsel, or is of kin to either party to the action, or interested, or is biased or prejudiced in the cause, or if for any other reason said judge is unable to hold court." (28 U. S. Stats. at Large, 21.)

It is contended that by this act of congress, the right to

take a change of venue from the county on account of the disqualification of the trial judge because of having been of counsel in the case, or on account of bias or prejudice, was abrogated. We do not think so.

Manifestly, congress did not intend by this act to repeal the provision in the organic act above quoted, which provides that in a civil case a change of venue may be taken. Nor is the act in conflict with the provisions of section 56 of the code of civil procedure, whereby the legislature provided that a change of venue may be taken when the judge has been of counsel in the case, or is interested in the cause. The doctrine seems to be firmly established that before an act of the legislature should be declared unconstitutional and void, its invalidity should be clearly established. In our opinion the federal law and the territorial law are not inconsistent or repugnant. It is true that if the territorial law should conflict with the federal law, or should be inconsistent with it, or should destroy or impair its force or effect, it would be clearly invalid.

Nor did congress, in our opinion, intend to repeal by implication the provision of the organic act of this territory providing for a change of venue in civil cases. The rule is well settled, by an unbroken current of decisions, that repeals by implication are not favored.

In *Wood v. United States,* 16 Peters, 342-362, Mr. Justice Story, speaking for the court upon the question of the repeal of a statute by implication, says:

"That it has not been, expressly or by direct terms repealed, is admitted; and the question resolves itself into the more narrow inquiry, whether it has been repealed by neces-

sary implication. We say, by necessary implication; for it is not sufficient to establish, that subsequent laws cover some or even all of the cases provided for by it; for they may be merely affirmative, or cumulative or auxiliary. But there must be a positive repugnancy between the provisions of the new law, and those of the old; and even then the old law is repealed by implication, only *pro tanto,* to the extent of the repugnancy."

In *State v. Stell,* 17 Wall. 425-430, the language of the court was that:

"It must appear that the later provision is certainly and clearly in hostility to the former. If, by any reasonable construction, the two statutes can stand together, they must so stand. If harmony is impossible, and only in that event, the former law is repealed in part or wholly, as the case may be."

In *Frost v. Wenie,* 157 U. S. 46, it was said:

"Where two statutes cover, in whole or in part, the same matter, and are not absolutely irreconcilable, and no purpose to repeal the earlier act is expressed or clearly indicated, the court will, if possible, give effect to both."

The manifest purpose and intent of the federal law is that in any particular case, where the judge of the district court is, for any reason, disqualified, either party to the cause, if he so desires, may apply to the supreme court, or the chief justice thereof in vacation, to have the judge of another district designated to try said cause, but it does not mean that a change of venue cannot be taken from the county. There is no question in the case at bar as to the disqualification of the trial judge, and the defendants had, in our opinion, two separate and distinct remedies. First, a change of venue from

the county. Second, they could have made application to the supreme court, or the chief justice thereof in vacation, to have another district judge designated to try the case. The statute is plain and mandatory. It leaves no discretion with the judge when the disqualification is shown.

This identical question was before this court in the case of *In re Brown,* 2 Okla. 590, where it was held that the right to a change of venue granted by section 56 of our code is a right belonging to either party to the action, is absolute and clear, and is not superseded by any other statutory provision. Mr. Justice Bierer, after quoting the federal statute in reference to this matter, and also section 56 of our code, used the following language:

"Did congress by this last provision take away the right of a change of venue from the county on account of the bias and prejudice of the presiding judge as is granted by sec. 3930, (sec. 56 of the civil code), of the Oklahoma statute? We think not. There is no conflict whatever between the two statutes. They can both stand, and one is not in conflict with or opposed to the other. The territorial legislative enactment provides for the taking of a change of venue from the county on application of either party in pursuance to the grant of right in the organic act; the congressional enactment provides for the designation of a judge of another district to try the cause in the district where it arose. Without this congressional enactment a judge of the district court could not be assigned to try a case in a district other than his own. (*Stanley v. United States,* 1 Okla. 336.)

"And this act of congress was passed, evidently to overcome such a difficulty in our judicial system, and was not intended to interfere with a provision properly made by enactment of the legislature for a change of venue."

In our opinion this case is decisive of this question, and correctly states the law. It follows that, the application for a change of venue, being in sufficient form and it being admitted that Judge Burwell was disqualified to try the case, the application for a change of venue should have been granted.

For the reasons herein stated, the judgment of the district court of Oklahoma county is reversed and the cause remanded with directions to grant a new trial, and to further proceed in consonance with the views herein expressed.

Burford, C. J., who presided in the court below, and Burwell, J., having been of counsel, not sitting; all the other Justices concurring.