AYLESBURY MERCANTILE CO. v. FITCH.

No. 2048, Okla. T.   Opinion Filed November 12, 1908.

(99 Pac. 1089).

1.  **TROVER AND CONVERSION—What Constitutes Conversion.**
    Conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.

2.  **SAME—Title to Property—Qualified Right in Defendant.** In a case where a retail merchant becoming indebted to a wholesaler executed a note therefor securing its payment by a chattel mortgage on his stock, and a contemporaneous written agreement under which he and his creditor entered jointly into possession of the stock for the purpose of selling the same at retail to liquidate the debt, the sale of a portion of such stock at prices less than its value, or the negligent use of the unsold portion, by such creditor while so in possession, or the unauthorized exclusion of such debtor from the store except during business hours, when he returned and assisted in conducting the business under the contract, would not constitute a cause of action for conversion of such stock, but one for a breach of contract.

3.  **SAME—Evidence of Conversion by Mortgagee.** Where, in such a case, the creditor subsequently takes exclusive possession of and appropriates the stock of goods without action, or by replevin under the clause of the chattel mortgage, granting such privilege in certain contingencies, the same being taken over the protest and against the will of the debtor, such taking would constitute a conversion of the stock for which the creditor would be liable, where at the time either the debt had been extinguished or the contingency provided for had not lawfully arisen.

4.　　SAME—Damages—Mitigation—Return of Property. Where, in such a case, the property is returned to and accepted by the debtor prior to the beginning of the action, this fact is to be considered in mitigation of any damages recoverable.

5.　　SAME—Measure of Damages. If the property be wrongfully taken and is on the order of the court placed in the hands of a receiver, the measure of the owner's damages for loss of goods or depreciation in value is the difference between the market value thereof at the time of taking and their value at the time the receiver comes into possession.

6.　　ACTION—Joinder of Causes—Tort and Contract. Causes of action in tort may be joined in separate counts in the same petition with causes of action in contract, when they all arise out of the same transaction or transactions connected with the same subject of action, and affect all the parties to the action.

Turner, J., dissenting.

(Syllabus by the Court.)

*Error from District Court, Kingfisher County; C. F. Irwin, Judge.*

Action by the Aylesbury Mercantile Company against H. C. Fitch. Judgment for defendant, and plaintiff brings error. Reversed and remanded.

*C. H. Brooks, P. S. Nagel,* and *Matthew J. Kane,* for plaintiff in error.
*Bradley & Bradley,* for defendant in error.

DUNN, J. The controversy in this case grows out of a transaction between plaintiff in error, plaintiff below, and the defendant in error, defendant below, in dealing with a stock of general merchandise, located in the town of Hennessey, Okla. Prior to the making up the issues in the pleadings, the case was submitted to a referee with authority to settle the issues, take the evidence, and report with findings of fact and conclusions of law. This reference on the part of the court was made with the consent of both parties to the action. The referee acted in accordance with the reference, and the record made before him, now before us, covers nearly 700 pages of matter, consisting of pleadings, exhibits and evidence. He found for the defendant and against the plaintiff on all the issues, made his report to the district court,

which, after hearing the exceptions urged thereto by the plaintiff, overruled them and confirmed the report. Plaintiff thereupon took the case by proceedings in error to the Supreme Court of the territory of Oklahoma, and the same is now before us by virtue of our succession to that court under the terms of the Enabling Act (Act June 16, 1906, c. 3335, 34 Stat. 267), and the Schedule to the state Constitution (Bunn's Ed. §§ 449-493).

In view of the fact that we are unable to agree with the referee in certain findings of fact, which we regard as not reasonably supported by the evidence, and which, in our judgment, are controlling in the case, as on these were based his conclusions of law, we briefly state the facts as we find them to be shown by the evidence in the case, which evidence is nearly, if not quite, uncontradicted. All of the record and evidence on which he acted was returned by him and made a part of his report, and is now before us. The contracts under which the parties acted were in writing, and are before us for our consideration, just as they were before the referee. Moore on Facts, vol. 2, § 1278; *Faulkner v. Simms,* 68 Neb. 299, 89 N. W. 171, 94 N. W. 113.

Prior to November, 1901, H. L. Fitch, a gentleman somewhat advanced in years, owned and was in possession of a stock of general merchandise in the town of Hennessey, Okla. He was indebted to a local bank in the sum of $175, and to plaintiff in the sum of $600. While this condition existed, and in the fore part of November, 1901, he transferred by bill of sale the said stock of goods to his son, H. C. Fitch, this defendant, and, on making the said transfer, delivered to him the possession thereof. On this taking place, the bank attached the stock of goods for its debt as the property of H. L. Fitch. The store was closed and placed in the hands of the sheriff, who was invoicing it when W. A. Story, vice president and credit man of plaintiff, the Aylesbury Mercantile Company, appeared on the ground for the purpose of looking after and protecting the debt due his house. Finding the store closed and the stock of goods in the hands of the

sheriff, he proposed to defendant, H. C. Fitch, then the owner thereof, that he would take up and pay off the indebtedness of the bank, release the stock, add this to the amount then due from the father, the payment of which had been assumed by the defendant, and take from him a note covering the entire amount, to be secured by a chattel mortgage on the stock. This was accordingly done, and the defendant executed a note covering the whole indebtedness, with some other charges, in the sum of $836.95, to the plaintiff, dated November 12, 1901, drawing 8 per cent. interest, due six months after date, the payment of which was secured by a chattel mortgage on all of the merchandise going to make up the stock, as well as the furniture and fixtures. This mortgage contained the usual covenants of instruments of that character, and provided that, if the party to whom it was given should at any time deem itself insecure for any cause, it should be lawful for it to take the property wherever the same could be found, and dispose of it at public auction or private sale, without notice, etc. At the same time, and as a part and parcel of the same contract, the plaintiff and the defendant entered into a writing, entitled "Contract and Agreement," which, owing to its importance in this controversy, we copy in full. It is as follows:

"Know all men by these presents, that Aylesbury Mercantile Company of Wichita, Kansas, party of the first part, and Harry. C. Fitch, enter into the following stipulated agreement, and contract, as follows, to-wit:

"Witnesseth: That the said party of the first part has a mortgage on the general stock of goods, wares and merchandise dated of even date herewith and signed and executed by the party of the second part. The Aylesbury Mercantile Company hereby agrees to sell Harry C. Fitch staple groceries which will be necessary in running the business, selling the goods at retail in the usual line of business for cash, at the lowest market price.

"It is further agreed the Aylesbury Mercantile Company will put ——————————— in charge of their interest, at a salary of fifty dollars per month to assist the said Harry C. Fitch in carrying on the business in paying off said mortgage.

"It is understood and agreed that Harry C. Fitch's salary is

to be fifty dollars per month, that said salaries are to be deducted from the proceeds of the business under the head of running expenses, the proceeds of the said indebtedness the sum of $836.95, after deducting the said running expenses from the said net proceeds are to be applied to the above described indebtedness.

"It is hereby expressly agreed that written consent is given hereto to sell and dispose of the above described goods without violating any statute that may be in force from prohibiting the sale of property where there is a recorded lien by said mortgage herein, that this agreement shall take effect and be in force during the entire period of the time of the aforesaid mortgage above referred to.

"Witness my hand this 13th day of November, 1901.

"Aylesbury Mercantile Company,

"By W. A. Story, V. P.

"Harry C. Fitch.

"Signed and executed in the presence of the named witnesses:

"G. W. Baker.    H. L. Fitch."

November 16, 1901, under the arrangement thus made, plaintiff and defendant opened the store, after making an invoice of the goods contained therein, and began selling the same at retail, which continued until the 19th day of December, 1901, or for approximately a period of one month. It appears from the evidence that the plaintiff placed upon the door of the store a different lock, delivering the key thereof to one Charles Dumar, who, under the contract, was the party placed by the company "in charge of their interest." The defendant was given no key, and was excluded from the store except during the hours of business, when he, in conjunction with Dumar, sold goods at retail during the entire period the business was so operated. Defendant objected to being denied a key to the store so that he might go and come at other times than during the time the same was open for business. Dumar employed to assist, at a small salary, a young woman of the community, to whom it appears the defendant objected. It is also claimed on the part of the defendant that Dumar and the young woman sold goods at sacrifice prices, far be-

low their actual value, and that this was done over the protest and objection and to the great loss of the defendant. It is further contended that the store was not opened by Dumar as early in the morning, and was not continued open as late in the evening, as defendant desired, and as he claimed was customary for stores so situated, and as he insists the demands of such business properly conducted required. Furthermore, it is the claim of the defendant that the young lady who was introduced into the store by Dumar was not of good reputation, and that the relations existing between her and Dumar were improper, and that these things became so notorious that the reputation of the store was injured thereby.

On December 16, 1901, after the store and business had been conducted as above set out for the period of one month, the defendant, acting under that portion of the agreement in which the plaintiff agreed to sell him "staple groceries which will be necessary in running the business, selling the goods at retail, in the usual line of business for cash at the lowest market price," wrote a letter to plaintiff containing an order for groceries, which was as follows: "Please ship by freight at once, the following goods which we are in need of at the store." That, on receipt of this letter, W. A. Story, acting for the plaintiff, came from Wichita, Kan., to Hennessey, Okla., for the purpose of investigating the running of the business and to look after its security. He found that up to this time, the store having been in operation about 30 days, there had been received for goods sold the sum of $602.40, of which $127.72 had been paid for salaries of the employes and other expenses, leaving a balance of $474.75, which was credited on defendant's note. It appearing from the evidence that the sales had been constantly diminishing, until, as Story states, the business was eating itself up, he thereupon locked the door, and further selling ceased, the entire possession being then taken by plaintiff.

Things remained in this condition until the 30th day of

December, 1901, a period of about 10 days, when defendant, acting under the authority of section 3572, Wilson's Rev. & Ann. St. Okla. 1903, secured an injunction restraining plaintiff from proceeding to sell the stock under the chattel mortgage without a proceeding of foreclosure, and defendant recovered possession of the stock of goods. He retained possession until the 30th day of January, 1902, or a period of one month, during which time he sold from the stock $106 worth of goods. The stock was then taken by plaintiff in an action of replevin begun by it January 24, 1902. On June 25, 1902, it also brought foreclosure proceedings on its note and mortgage, and on August 7, 1902, on its application, a receiver was appointed to take possession of the goods, and dispose of them under the order of the court. It is defendant's contention that the stock was misused by plaintiff on securing possession, under the action of replevin, by being improperly, carelessly, and negligently packed and stored, and that by reason thereof it greatly deteriorated in value. The receiver, under the order of the court, finally sold the same on the 20th day of December, 1902, receiving therefor the sum of $325.

The action of replevin and the suit for foreclosure were consolidated, and referred to D. K. Cunningham, Esq., with authority, as above set out, to settle the issues, hear the evidence, and report to the court, with his findings of fact and conclusions of law. Defendant to this consolidated suit filed answer and cross-petition, in which he admitted the incorporation of the plaintiff, and the execution of the written instruments above mentioned, but denied any indebtedness to plaintiff, or that it was entitled to the personal property described in its petition, and avers that he had fully paid plaintiff all that was due on the note and chattel mortgage prior to the commencement of either action. For a cross-petition, he admitted generally the facts above stated, in reference to the original indebtedness due from himself to the plaintiff, and the assumption by the plaintiff of the debt due the bank, and the execution and delivery of the note, chattel mortgage, and contract, but averred

Vol. 22—31

that plaintiff induced their execution through false representations and promises, except for which they would not have been executed, and that on their execution plaintiff wrongfully, unlawfully, and by force took possession of all of said personal property, placed a padlock on the front door of the store, and locked defendant out and kept him out of the said store every ·evening, and did not open the store in the morning for business until about 9 o'clock a. m.; averred that the value of the stock was about $5,000, and that while the store was opened for business the said Dumar and the young woman employed sold merchandise at ruinously low prices, and, in addition thereto, injured by careless handling the goods which they did not sell. He entered into much detail in setting out the different items of goods sold by plaintiff for less than their value, all of which constituted a pleading, showing on the part of· plaintiff a breach of the contract. He further averred improper care of the goods in the packing and storage after they were taken from him in the latter part of January, 1902, and sets up specifically the damage done to the counters, shelvings, and store furniture, and then prays for the total value of the goods and furniture which he alleged plaintiff converted on the 16th day of November, 1901. For further damages he pleaded that, by the wrongful acts complained of, he was damaged in the sum of $5,000 on account of the destruction of his business, and $2,000 on account of the loss of credit and reputation. The reply was a general denial.

On these issues and the evidence introduced, the referee found that the plaintiff was liable to the defendant in damages for conversion of all the goods, wares, merchandise, furniture, and fixtures, at their value on the 16th day of November, 1901; that the value of the same was $5,000; that on this plaintiff was entitled to a credit of $836.95, with interest thereon from the 12th day of November, 1901, at the rate of 8 per cent. per annum, which was the amount of the note and the rate of interest provided for and set out in plaintiff's petition; that, in addition thereto, plaintiff was entitled to a credit of $106.95, being the amount of goods

defendant claims to have sold while in possession of the stock during the month of January, 1902; denied defendant any damage for loss of business and reputation of his store, for the reason that the same was too indefinite, uncertain. and speculative, and gave judgment against plaintiff in the sum of $4,945.50.

From the foregoing it will be observed that the referee based his entire conclusion upon finding that there was a conversion of the stock by plaintiff at the time it and the defendant entered into the possession of the same under the contract on the 16th day of November, 1901. This raises the question, in the forefront of our consideration of the case, as to whether, under the controlling and undisputed facts, there was a conversion at that time, or whether the plaintiff after entering the store, in charge of its interests, by and with the consent of the defendant, and its subsequent doings therein as pleaded by defendant prior to December 19, 1901, constituted a breach of the contract under which all parties were acting. The materiality of this inquiry is at once apparent. Counsel for defendant in his cross-petition, while urging a conversion of the stock of goods at that time, was unquestionably impressed with the force of the reasoning that plaintiff was guilty of a breach of contract, rather than conversion, as is shown by the minuteness of his cross-petition, in which he detailed the different articles of merchandise sold by the plaintiff at a price less than their true value. If there was a conversion, it was of no consequence to the defendant what plaintiff did with the goods after taking them into possession. So far as defendant was concerned, he had elected, if the goods were converted, to accept a judgment for the value of the goods rather than the goods themselves, and, when this election had taken place, it was of no concern of the defendant what plaintiff did with them, as any loss incurred would fall on plaintiff, and not on defendant. While, on the other hand, if there was a breach of contract instead of a conversion, the pleading by the defendant was entirely proper for the damages incurred by the sacrifice of the goods, but the damages would not be the value of the en-

tire stock, but the difference only between the market value of the goods sold and the sum plaintiff received therefor. If plaintiff violated the terms of the contract by the employment of the young woman to whom reference is made, and wrongfully paid money belonging to defendant to her for her services, then defendant's damages would be the amount of money which was so paid her. The measure of damages for conversion is laid down in section 2752, Wilson's Rev. & Ann. St. Okla. 1903, as follows:

"The detriment caused by the wrongful conversion of personal property is presumed to be: First, the value of the property at the time of the conversion with the interest from that time; or, second, where the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party; and, third, a fair compensation for the time and money properly expended in pursuit of the property."

While the measure of damages for a breach of contract as laid down under section 2730, Wilson's Rev. & Ann. St., *supra,* is as follows:

"For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this chapter, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which in the ordinary course of things, would be likely to result therefrom."

While the Code has abolished the numerous common-law forms of actions, and all civil rights are now justifiable in a single proceeding known as a "civil action," it has not nor could it abolish the rights, duties, and liabilities enjoyed, incurred, and borne by men in their intercourse and dealings with each other. Elucidating this idea, Judge Irwin in the case of *Phelps, Dodge & Palmer Company v. Halsell & Frazier,* 11 Okla. 1, 65 Pac. 340, said:

"To arrive at a correct solution of the question before the court, it will be necessary to consider the law of conversion, and especially to determine the nature of the action of conversion. It may be contended that under our Code the procedure or forms of

action have been abolished.  While we have but one form of action in this territory, this does not mean that every action which is brought is controlled by the same rules of law.  All actions which are not criminal we call civil, but this does not mean that there is now one kind of civil action.  We have the same kind of actions, practically, as existed at common law.  We have actions in attachment, replevin, injunction, mandamus, ejectment, etc.  Each of these actions has its own rules of law, and, except when modified by statute, is subject to common-law principles.  It would be impossible to conduct the business of courts without keeping in mind the essential distinctions existing between the various kinds of actions.  By its very nature the practice of law must have some consistency, and when an action is brought in court there must be some way of determining what the character of the action is, and these distinctions are by no means artificial.  They are perfectly material, and are necessary to the protection of the rights of litigants, as well as for the information and guidance of the court."

The parties to this action, as members of organized society, owed each other the duty to respect the ownership and right to possession of each to his own property; should either deprive the other thereof without right, the taker then owed the duty of paying therefor, the measure of this payment being set out in the paragraph of the statute first above quoted.  Should the parties, however, enlarge their relationship toward each other by entering into a lawful contract involving the property of one, both are entitled to have its provision fulfilled; should either, acting under this agreement, fail, neglect, or refuse without lawful right to carry out his engagement according to the terms, his liability is measured by the second paragraph quoted, and in a case where it is insisted that either of these rights have been violated modern procedure requires that the written allegations of the parties to the action state the facts, that the proof support and be consistent therewith, and the judgment rendered be in consonance with both.  These requirements are not to vindicate a mere dogmatic form prescribed to secure symmetry only, but are absolutely essential to secure the administration of justice.  A party is entitled to know

on entering an action just wherein and how he is charged with having violated an obligation. This constitutes notice to him so he may be prepared in his own right and to assist the court with relevant testimony to ascertain the truth. He is then entitled to have the judgment rendered based on the evidence offered in support of the specific averments of the pleadings, as they may be finally settled by the court. So in the case at bar the necessity of clearly distinguishing the nature of the responsibility on the facts becomes at once apparent, the pleadings and evidence under one being confined to asserting and establishing the detriment caused by the loss of the value of the whole property involved with the additional elements mentioned in the statute, while under the second the measure of damages is such as are shown to grow out of the failure of the delinquent party to comply with his engagement. The cross-petition of defendant herein contains averments showing a breach of contract and much testimony is offered to support them. The prayer was for a conversion, and the judgment rendered was in conformity with the prayer rather than the allegations and the evidence.

Now let us see what constitutes conversion, and if under the facts found in this case there was a conversion of defendant's property on the 16th day of November, 1901, or whether the acts of plaintiff constituted a breach of the contract under which both acted.

In 21 Encyclopedia of Pleading and Practice, p. 1014, the general rule as to what is required to constitute conversion is laid down as follows:

"Any distinct act of dominion wrongfully exerted over another's personal property in denial of his right or inconsistent with it amounts to and may be treated as a conversion for which trover is a remedy."

The Supreme Court of the state of Minnesota in the case of *Latusek v. Davis et al.,* 79 Minn. 279, 82 N. W. 587, states the facts necessary to maintain an action of conversion to be as follows: First, a proof of a general or special property in plaintiff;

second, the right of possession at the time of the conversion; and, third, that the defendant had converted the same to his own use. The right to recover is then established.

The case of *Moore v. McKibbin,* from the Supreme Court of New York, 33 Barb. 246, was one wherein an agent was intrusted with certain horses to sell for a sum not less than $500, and who sold them for $200. He was sued in conversion, and the court held in the syllabus:

"Where an agent, intrusted to sell property for not less than a specified sum, sells the same for less than the price fixed, an action for the conversion of the proprety will not lie against him. Where the complaint is for a wrongful conversion of property, and the proof establishes another and different cause of action, viz., a mere breach of duty on the part of the defendant, it is not a case of variance, which may be remedied by amendment, but is a failure of proof of the cause of action alleged, and the plaintiff should be nonsuited."

In the discussion of the case, the court said:

"The case of *Sarjeant v. Blunt,* 16 Johns. (N. Y.) 74, is directly upon the point that an action for the conversion of the property will not lie against an agent for selling under the price fixed. The same rule is laid down in *Cairnes & Lord v. Bleecker,* 12 Johns. (N. Y.) 300, though the point was not there decided. See, also, *McMorris v. Simpson,* 21 Wend. (N. Y.) 610. This must be so upon principle, or else the purchaser would get no title. No one; I apprehend, would pretend that the purchaser did not get a good title because the agent, having power to sell, sold for a price something less than he was instructed to sell at. If the purchaser gets a good title, it must be upon the ground that the agent had the right to sell. If he could sell and transfer a valid title, the sale could not be tortious. The wrong in such a case consists, not in the act of selling, which is authorized, but in the breach of duty in selling at the reduced and unauthorized price. It is not the want of authority, but the exercise of it contrary to the measure prescribed, which constitutes the wrong."

The case of *Sarjeant v. Blunt,* favorably cited in the quotation from *Moore v. McKibbin, supra,* was one wherein the plaintiff deposited a chronometer with the defendant, to be sold by

him for a price not less than $500. The defendant sold the same for $300. The court in this case held in the syllabus as follows:

"When goods are deposited with a person, to be sold at not less than a certain fixed price, and the depositary sells the property at less than that sum, the owner cannot maintain trover against him, but the proper remedy is a special action on the case."

Another case from the Supreme Court of Minnesota, that of *Chase et al. v Blaisdell,* 4 Minn. 90 (Gil. 60), was one where Blaisdell sued the appellants, setting out in the complaint a contract by which they were to pick up and sell certain logs and make returns to him, averring the sale of the logs by them pursuant to the agreement, but that they failed to make returns and account to him according to the contract. The verdict being rendered for plaintiff, appeal was taken to the Supreme Court, which held in the syllabus that:

"Where a party comes into possession of and disposes of property pursuant to an agreement with the owner, he cannot be held for a conversion of the property. His liability, if any, grows out of the disposition of the proceeds of the property, and in such case the value of the property disposed of is not the measure of damages."

In the discussion of the case, the court said:

"Had the defendants become possessed of the plaintiff's logs without authority from him, and converted them to their own use, or, being lawfully possessed, had they afterwards made any disposition of them contrary to authority, they would have been liable in damages for the conversion, and the measure of such damage would have been the value of the logs. But when, as in this case, a party comes into possession of property under an agreement with the owner, and afterwards sells it, in pursuance of the terms of the agreement, for the sole use and benefit of the owner, he cannot by any possibility be guilty of converting the property originally intrusted to him, and his only responsibility results from the disposition he may make of the proceeds of such sale. If the proceeds be in money, and he refuse to pay it over, upon reasonable demand, or contrary to the terms of the agreement with the owner, he would be liable therefor as for so much money had and received; or, if the proceeds consist of property other than money, he, upon a like refusal, would be held to have converted it (the proceeds) to his

own use, and would be liable in damages, the measure of which would be the value not of the property originally committed to his charge, for that, having been sold in pursuance of authority, has never been converted, but the value of the property received in exchange therefor. * * * The defendants could not be held for more than they received on the sale of the logs, unless they wilfully or negligently sold them below their value, in which case there would have been an allegation to that effect, and a special claim for the damages sustained by reason thereof."

To constitute conversion for which trover will lie, nonconsent to the possession and disposition of the property by the defendant is indispensable. *Van Dusen & Co. v. Arnold et al.*, 5 S. D. 588, 59 N. W. 961.

And it is essential to the right of recovery that plaintiff have a right to immediate possession of the goods at the time of the alleged conversion. *Robison et al. v. Hardy et al.*, 22 Ill. App. 512.

Other cases to the same effect are as follows: *McMorris v. Simpson*, 21 Wend. (N. Y.) 609; *Worth v. Buck & Greenwood*, 34 Neb. 703, 52 N. W. 566.

Thus, we conclude that under the facts as shown in this case, plaintiff having gone into possession under and by virtue of the contract, which provided that it might place an agent in charge of its interest, he had the right to sell the goods, and, the defendant having consented to the same, there could be no conversion of the stock. We suppose that defendant would hardly contend that the people to whom plaintiff sold goods from the store secured no title thereto, and yet, if they did, there would be no conversion. If there was a conversion on the part of the plaintiff, it had no title, and defendant might have maintained an action of conversion or replevin against all of the customers purchasing goods, equally as well as an action against plaintiff itself. Does any one think this could have been done? Nor are we able to find any sufficient evidence on which to predicate the finding that the contract was procured by fraud. The action of both parties under it, the acquiescence in its operation for 30 days, all, stronger than any spoken words, fixed the validity of the instrument under the terms

of which they acted. The action of the defendant in entering jointly with the agent of plaintiff into the possession of the stock and remaining there, assisting in the sale of the goods under the contract for 30 days and then ordering more goods, is absolutely inconsistent with any theory of fraud or conversion. So that we hold that there was no conversion in plaintiff taking possession of the stock jointly with the defendant under the contract above referred to, and that whatever wrongful acts may have been committed by it while thus in possession were breaches of contract, and damages would lie against it for any specific injuries sustained by the defendant from these breaches, and that the pleadings and the evidence on this phase of the case should be restricted to these things.

On the closing and taking possession of the store by the plaintiff on the 19th day of December, 1901, entirely excluding defendant therefrom, if against his will, as he contends, a new and a different situation arose, the effects of which depend upon the following conditions: If the debt secured by the mortgage had been extinguished, or if not, if the condition under which plaintiff might lawfully take possession of the stock under its chattel mortgage had not arisen, then its taking exclusive possession of the goods against the will of the defendant, and over his protest, was wrongful, and would amount to a conversion, for which he could maintain an action, even though the goods were recovered by him, as shown by the evidence at the expiration of 10 days. See 28 American & English Encyclopedia of Law, p. 683, where the general rule in such cases is stated as follows:

"It seems to be well settled that trover for a conversion may be maintained, in case of an unlawful taking or exercise of dominion over the chattels of the plaintiff, though the property may have been returned to the plaintiff and accepted by him prior to the institution of the action, or though he may have reacquired possession by purchase from a third person or by means of an action of replevin."

Plaintiff's measure of damages in such a case is stated in the same volume, at page 684, to be as follows:

"Where the property has been returned to and accepted by the plaintiff, this fact is to be considered in mitigation of the damages recoverable for the conversion, and in some instances it has been held that the court had power to permit the defendant to return the chattel in mitigation of damages."

Defendant reacquired possession of the stock of goods on the 30th day of December, 1901, and held the same until the 29th of January, 1902, when it was again taken from him under plaintiff's action in replevin. The goods were then, as stated above, taken into possession by the plaintiff and held by it until turned over to a receiver, appointed by the court in August following. On this occurring, we are again confronted by the same propositions that arose at the time of the taking of the goods in December. If plaintiff's debt had not been liquidated, and the situation was such as to legally entitle it to possess itself of the stock under its chattel mortgage, then there was no conversion, but its possession was lawful. If, on the other hand, the debt had been extinguished, or the condition mentioned had not arisen, then its possession was tortious, for which it was liable in damages to the defendant. The goods, it will be remembered, were on the 7th day of August, 1902, placed in the hands of a receiver, and the correct measure of plaintiff's damages under such a case is laid down in the case of *Tootle et al. v. Kent et al.*, 12 Okla. 674, 73 Pac. 310, as follows:

"The measure of plaintiff's damages for loss of goods, or depreciation in value, is the difference between the market value of the goods at the time they were taken possession of under the chattel mortgage by the defendants, and its value at the time the property was placed in the hands of the receiver."

Of course, being placed in the hands of a receiver, plaintiff would not then be liable for any depreciation or loss in the value of the goods by reason of any improper care or wrongful act on the part of the officer, as he would then be the one responsible therefor.

The conclusion to which we have come in this case necessarily

presents to the defendant the question of whether or not his claim for damages growing out of the alleged breach of contract and his claim of damages growing out of the alleged conversion may be joined in the same cross-petition. Believing that this question is properly within the scope of the case as presented to us, we have considered it, and hold the general rule to be as is stated in 23 Cyq. 415, wherein it is laid down that:

"Under the codes, as at common law, a cause of action in tort cannot as a general rule be joined with a cause of action on contract [here follows a number of exceptions]. * * * Another general exception results from the provision, in many of the codes, that causes of action arising out of the same transaction or transactions connected with the same subject of action may be joined, and the same exception has been drawn from the general intent of the codes, in the absence of such an express provision as just stated."

Under this there are cited a variety of cases from a great number of the so-called "code states." Justice Valentine of the Supreme Court of the state of Kansas, from which our Code is taken, in the case of *Hoye et al.* v. *Raymond,* 25 Kan. 665 (2d. Ed., 465), in dealing with the question, said:

"Causes of action in tort can only be united with causes of action on contract where they all arise out of the same transaction or transactions connected with the same subject of action. Civ. Code, § 83. But even then they cannot be united unless they all 'affect all the parties to the action.'"

This is cited approvingly by the same court in the case of *Haskell County Bank* v. *Bank of Santa Fe,* 51 Kan. 39, 32 Pac. 624. In an earlier case in the discussion of this section of the Code, Justice Valentine, in the case of *Scarborough* v. *Smith,* 18 Kan. 399, enters into an elaborate discussion of the scope and meaning of this section of the Code. But these different causes of action, the one for breach of contract, and the one sounding in tort, should be stated in separate counts of the petition: *Shinn v. Guyton & Harington Mule Company,* 109 Mo. App. 557, 83 S. W. 1015. The causes of action in this case all arose out of the

same transaction or transactions connected with the same subject of the action—which was defendant's claim of right in and to the goods involved—and hence may be joined in separate counts in one petition.

It therefore follows that the judgment of the district court is reversed, and the case remanded for a new trial, with instructions to grant defendant the right to amend his pleadings and proceed in accordance with the principles declared herein.

Williams, C. J., and Hayes, J., concur; Turner, J., dissents; Kane, J., being of counsel, disqualified and not sitting.