## COLUMBIA BANK & TRUST CO. v. UNITED STATES FIDELITY & GUARANTY CO.

No. 1372.    Opinion Filed April 9, 1912.

Rehearing Denied September 10, 1912.

(126 Pac. 556.)

1. **PRINCIPAL AND SURETY—Remedies of Surety—Action Against Principal.** A surety may maintain an action against his principal, to compel him to discharge the debt or liability for which the surety is bound, after the same has become due.

2. **SAME—Construction of Contract—Strict or Liberal Construction.** Section 1569, Comp. Laws 1909, which provides that the rule of the common law requiring a strict construction of the obligations of a surety shall have no application to the obligations of a surety or guarantor or indemnitor for hire, but all such obligations shall be liberally construed, in accordance with the rules of the general law applicable to policies of insurance, prescribes a rule of construction to guide the courts of this state, but does not otherwise affect the rights of a surety, where there is no ambiguity in the contract of suretyship.

3. **BANKS AND BANKING — Deposits — Guaranty Fund.** Section 7943, Comp. Laws 1909, which provides that, until the permanent school funds may be safely and advantageously invested in the securities prescribed by law, the commissioners of the land office are authorized to deposit said funds in such banks or trust companies as they may select, but shall in every case take as security for such deposits the following classes of securities and no others:  Bonds of the state of Oklahoma, bonds of the counties, school districts, cities, and towns of this state, state and county warrants, and approved state, county, and municipal bonds of other states, bonds of the United States, first mortgages on real estate, warrants or other legal evidence of indebtedness authorized by law to be issued by municipalities in payment of paving, sewer, waterworks, electric lights, or other public indebtedness, and for which a special tax is authorized to be levied and collected for the payment thereof, and surety company bonds, and as additional security on any deposit which said board may make the said commissioners of the land office shall have authority to accept surety companies or trust companies as sureties, but in each case said board of land commissioners shall accurately investigate the value of securities offered for such deposits, provided, however, such surety company or trust company shall neither be in any manner interested directly or indirectly in any bank or trust company for which it becomes additional surety; nor shall any surety, bonding, or trust company be accepted as additional surety that has more than one-fourth of its paid capital invested in bank stock—pro-

vides a specific system for the protection of any part of the permanent school fund temporarily deposited in such banks or trust companies, and the protection extended to general depositors by virtue of the police power of the state, by section 323, Comp. Laws 1909, which provides for the depositors' guaranty fund, does not apply to deposits of the permanent school fund.

(Syllabus by the Court.)

Russell, Special Judge, dissenting in part.

*Error from District Court, Oklahoma County;*
*George W. Clark, Judge.*

Proceedings by E. B. Cockrell, Bank Commissioner, to wind up the affairs of the Columbia Bank & Trust Company. On application of the Bank Commissioner for an order of sale, the United States Fidelity & Guaranty Company files a petition in intervention. From a judgment for intervener, the Bank Commissioner brings error. Reversed and remanded, with directions.

*Ledbetter, Stuart & Bell,* for plaintiff in error.

*Flynn, Ames & Chambers,* for petitioner, the United States Fidelity & Guaranty Company.

KANE, J. The questions presented for decision arise out of the winding up of the affairs of the Columbia Bank & Trust Company by the Bank Commissioner of the state. Hereafter the Columbia Bank & Trust Company will be referred to as the bank, and the United States Fidelity & Guaranty Company as the surety company. On the 29th day of September, 1909, the Bank Commissioner took possession of the bank and its assets under and by virtue of the authority conferred upon him by the laws of the state in relation to insolvent banks and trust companies, for the purpose of paying the depositors and other creditors of the bank. Thereafter the Bank Commissioner made application to the district court of Oklahoma county for an order authorizing him to sell certain promissory notes, bonds, and other securities of the bank. The application of the Bank Commissioner alleged, in substance, that he had taken possession of the bank, and that it was necessary to convert certain securities in order to pay off the depositors. The prayer consisted of a re-

quest for an order of sale, "and that the court make such other orders, in connection with the administration of the affairs of said bank, as may from time to time be necessary and proper, and that the said A. M. Young, as such Bank Commissioner, together with any and all creditors and depositors of said bank, be given and awarded by the court and the judge thereof all relief to which they may be entitled."

Thereafter the surety company filed its petition in intervention, wherein it alleged, in substance, that on the 18th day of May, 1909, it signed, as surety for said bank, a bond to the state of Oklahoma, for the sum of $50,000, to protect the state of Oklahoma against loss by reason of a deposit made in said bank of the funds coming into the possession of the commissioners of the land office of said state by virtue of their duties under the law; that ever since the Bank Commissioner had taken charge of the assets of said bank he had acted under the direction and control of the  state banking board, composed of the Governor, State Auditor, President of the Board of Agriculture, Secretary of State, and Superintendent of Public Instruction, so that the Governor, State Auditor, and President of the Board of Agriculture comprised a majority and quorum of both the state banking board and commissioners of the land office; that immediately after said Bank Commissioner had taken charge of said bank the secretary of the school land board, acting under the direction and control of the Governor, State Auditor and President of the Board of Agriculture, made what they claimed was a demand for the money secured by said bond upon said Bank Commissioner, and said Bank Commissioner, acting under the authority and control of the Governor, State Auditor and President of the Board of Agriculture, comprising a majority of the banking board, refused the demand made by the secretary of the school land board; that thereupon said majority of the commissioners of the land office demanded of said surety company the sum of $50,000, the penalty of said bond executed by said surety, said commissioners claiming that they had on deposit with said bank at the time of its failure a large sum of money, in excess of the penalty of said bond; that the Bank Commissioner, under

the direction of said majority of the board of land commissioners, comprising also a majority of the state banking board, had been paying the claims of other depositors in full without in any way protecting the said deposit made by the board of land commissioners; that, in the administration of the affairs of said bank, said Bank Commissioner had used in whole or in part, in paying off other depositors and creditors of said bank, approximately a half million dollars obtained from the depositors' guaranty fund; that it was the purpose and intent of said Bank Commissioner to pay off other creditors in full, to the exclusion of the deposit of the state of Oklahoma and the commissioners of the land office, secured by said bond of said surety company, and that the effect of said payments would be to unjustly and wrongfully prefer creditors who were being paid to the exclusion of the commissioners of the land office of the state of Oklahoma and to the detriment of the said surety company; that said surety company, at the time said Bank Commissioner took possession of said bank and its assets, was liable on said bond, and still remained liable thereon to the full amount, unless discharged by the wrongful and improper conduct of said Bank Commissioner and said banking board; that it was the purpose of said Bank Commissioner not only to pay off all other depositors of said bank to the exclusion of the state and the commissioners of the land office, but it was also the purpose of said Bank Commissioner to repay to said state banking board the depositors' guaranty fund which had been advanced by it in preference to the deposit secured by said bond of said surety company. The surety company prayed that said Bank Commissioner be enjoined from paying out any of the assets remaining in his hands to other creditors of said bank in preference to the state of Oklahoma and the commissioners of the land office, on account of the deposit secured by said bond of said surety company, and that said Bank Commissioner be restrained and enjoined from repaying to the banking board of the state of Oklahoma the guaranty fund advanced to him, or any part thereof, prior to the paying in full of the deposit secured by said bond of said surety company.

The cause was submitted to the court below upon the pleadings, whereupon a decree was rendered restraining the Bank Commissioner from repaying to the banking board- of the state of Oklahoma, or any other person or persons or officers, any part of the depositors' guaranty fund of the state of Oklahoma, which had been used, or was on hand, or available for use at the time that the commissioners of the land office made demand upon said surety company for $50,000, and said Bank Commissioner was ordered and directed to treat the amount due the commissioners of the land office as a deposit in said bank, and pay over to said depositors their pro rata share of the assets of said bank, and to further pay. to said depositors the deficit, if any there might be, after said distribution out of the guaranty fund which had been used, or which was on hand or available for use, on the respective dates on which demand was made by said depositors upon said surety company. Exceptions to the rulings of the court were reserved by the Bank Commissioner and said surety company, and the case is now here for review upon their petition in error and cross-petition in error.

The questions presented by the petition in error of the Bank Commissioner and the cross-petition of the surety company are: (1) Did the surety company have a right to maintain its petition of intervention without having previously- paid the penalty of its bond? (2) Is the deposit of the commissioners of the land office entitled to participate pro rata in the distribution of the assets of the bank? (3) After exhausting the assets of the bank, shall the deficit be paid by the guaranty fund, or by the surety company, or shall this deficit be prorated between the surety company and the guaranty fund?

The first question must be answered in the affirmative. By the terms of the bond the bank is called the principal, the surety company the surety, and the state of Oklahoma the obligee. This must be the legal relation of these parties in determining their rights and liabilities. Section 3606, Comp. Laws 1909, provides that "a surety may compel his principal to perform the obligations when due," and section 6055 provides that "a surety may maintain an action against his principal, to compel him to dis-

charge the debt or liability for which the surety is bound, after the same has become due." It is a well-settled principle that a surety may resort to equity to compel the principal to pay the debt from his assets, if he has any, or to have his assets applied to the debt before paying any part of it. *Walton et al. v. Williams et al.,* 5 Okla. 642, 49 Pac. 1022; Pomeroy's Eq. Jur. sec. 1417; Stearns on Suretyship, p. 544; Frost on Guaranty Insurance, sec. 304; 32 Cyc. p. 248; *Barbour v. National Exchange Bank,* 45 Ohio St. 133, 12 N. E. 5. Under our system of procedure, the distinctions between actions at law and suits in equity are abolished, leaving but one form of action, called a "civil action." It has been held, however, that "while the Legislature has abolished the distinction between actions at law and suits in equity, yet the Legislature has not intended thereby to change the nature of the remedies which generally obtain in those jurisdictions where courts of law and chancery are separated." *Olson v. Thompson,* 6 Okla. 74, 48 Pac. 184, affirmed on rehearing 6 Okla. 576, 52 Pac. 388; *Aylesbury Mercantile Co. v. Fitch,* 22 Okla. 475, 99 Pac. 1089, 23 L. R. A. (N. S.) 573. The prayer of the Bank Commissioner to the pleading instituting this proceeding is that "any and all of the creditors and depositors of said bank be given and awarded by the court and the judge thereof all relief to which they may be entitled." We know of no good reason why the surety company, who responded to this invitation, may not maintain its petition of intervention, and have its rights, if it has any, in relation to the bank guaranty fund, determined without having previously paid the penalty of its bond.

Counsel for the Bank Commissioner concedes that this view of the law might be correct, if it were not for section 1569, Comp. Laws 1909, which provides that "the rule of the common law requiring a strict construction of the obligations of a surety shall have no application to the obligations of a surety or guarantor or indemnitor for hire, but all such obligations shall be liberally construed in accordance with the rules of the general law applicable to policies of insurance." This section does not change in any way the general rule applicable to the questions necessary

to a decision in the case at bar. Under the old rule, a surety was a favorite of the law, his obligation was voluntarily assumed as an act of friendship, without reward, and therefore the courts were astute to relieve him of liability, and the rule applied to the construction of his obligation was *strictissimi juris*. On account of the rise of surety companies making it a business to assume these obligations for hire, the reason for the old rule passed away, and many of the courts, in dealing with the obligation of a surety for hire, have, in the absence of a statute requiring it, adopted the rule of liberal construction. The statute under consideration prescribed a new rule of construction to guide the courts of this state in construing contracts of suretyship, but does not affect the rights of a surety, where there is no ambiguity in the contract. "Written language has the same significance, and its meaning is to be ascertained by the same rules of law, where it is found in the contract of a surety as when it appears in other agreements." *American Bonding Co. v. Pueblo Investment Co.*, 150 Fed. 17, 80 C. C. A. 97, 9 L. R. A. (N. S.) 557, 10 Ann. Cas. 357. One of the rights of a surety is to compel his principal to pay the debt before the surety himself has paid it. This is the right the surety company is seeking to enforce.

Admitting the existence of the right, the question arises: What is the extent of the relief the surety company is entitled to? It contends that the deposit of the commissioners of the land office ought to be treated as all other deposits, and that the commissioners ought to participate pro rata in the distribution of the assets of the bank; that after the assets of the bank are exhausted, if there be a deficit, it ought to be paid out of the guaranty fund; that until the guaranty fund is exhausted, it ought not to be called upon to meet the obligations of its bond. We cannot agree with this contention. Section 323, Comp. Laws 1909, upon which it is based, reads as follows:

"In the event that the Bank Commissioner shall take possession of any bank or trust company which is subject to the provisions of this act, the depositors of said bank or trust company shall be paid in full, and when the cash available or that can be made immediately available of said bank or trust company

is insufficient to discharge its obligations to depositors, the said banking board shall draw from the depositors' guaranty fund and from additional assessments, if required, as provided in section two (320), the amount necessary to make up the deficiency, and the state shall have for the benefit of the depositors' guaranty fund a first lien upon the assets of said bank or trust company and all other liabilities against the stockholders, officers, and directors of said bank or trust company and against all other persons, corporations, or firms. Such liabilities may be enforced by the state for the benefit of the depositors' guaranty fund."

That the money deposited in the bank by the commissioners of the land office was a deposit in a broad sense is probably true; but it is clear to our minds that the commissioners of the land office are not such depositors and the funds which the law permits them to deposit in pursuance of their official duties are not such deposits as fall within the purview of section 323, *supra.* This was a special statutory deposit, with strict legislative bounds within which the depositor is required to act. The primary direction in relation to the disposition of such fund is that it shall be invested in first mortgages upon good and improved farm lands within the state of Oklahoma, Oklahoma state bonds, county bonds of this state, school district bonds of the school districts of this state, and United States bonds. Section 7942, Comp. Laws 1909.

Section 7943, Comp. Laws 1909, provides:

"Until such time as said funds may be safely and advantageously invested in the securities mentioned in the preceding section, said commissioners of the land office shall be and they are hereby authorized and empowered to deposit said sums in such banks or trust companies as they may select, but shall in every case take as security for such deposits the following classes of securities and no others: Bonds of the state of Oklahoma, bonds of the counties, school districts, cities and towns of this state, state and county warrants and approved state, county and municipal bonds of other states, bonds of the United States, first mortgages on real estate, warrants or other legal evidence of indebtedness authorized by law to be issued by municipalities in payment of paving, sewer, waterworks, electric light, or other public indebtedness and for which a special tax is authorized to be levied and collected for the payment thereof, and surety

company bonds, and as additional security on any deposit which said board may make the said commissioners of the land office shall have authority to accept surety companies or trust companies as sureties, but in each case said board of land commissioners shall accurately investigate the value of securities offered for such deposits, provided, however, such surety company or trust company shall neither be in any manner interested directly or indirectly in any bank or trust company for which it becomes additional surety; nor shall any surety, bonding or trust company be accepted as additional surety that has more than one-fourth of said capital invested in bank stock. The said board of land commissioners may, whenever they deem it advisable, require additional securities after a deposit is made as they deem necessary to secure the safety of the deposit."

It is apparent that section 7943, *supra,* imposes many limitations upon the deposit of the permanent school fund not applicable to the ordinary deposit. Sections 323 and 7943, *supra,* were enacted at the same session of the Legislature. The first section unquestionably was passed by virtue of the police power of the state, and of course must be general in its scope, and apply to all who are entitled to that sort of protection; the second section specifically relates to the funds of the state itself, and the particular subject embraced within its purview is the temporary deposit and protection of the permanent school fund until it can be invested in the manner prescribed by law. It is well settled that specific provisions relating to a particular subject must govern in respect to that subject, as against general provisions in other parts of the law, which might otherwise be broad enough to include it. 2 Lewis' Sutherland, Stat. Const. sec. 491.

In construing the foregoing sections as a starting point, it must be presumed that the legislative department, in its wisdom, by the enactment of the depositor's guaranty law, provided an adequate system to protect those entitled to its benefits against loss of deposits in state banks. This court has held the bank guaranty law to be sound in principle and free from constitutional objections. *Noble State Bank v. Haskell et al.,* 22 Okla. 48, 97 Pac. 590, which decision has been affirmed by the Supreme Court of the United States in *Noble State Bank v. Haskell et al.;*

219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487. If the bank guaranty law provides complete protection to those entitled to its benefits, why should the Legislature throw additional safeguards around the deposits of the commissioners of the land office, by the passage of section 7943, Comp. Laws 1909? In one of the briefs before us, counsel for another surety company, in a case involving the same propositions involved herein, anticipate this question, and answer it as follows:

"The Legislature knew that its offspring was not very strong at its birth. It knew that it would be attacked from every quarter, and it knew not how soon some federal court or state court might declare it absolutely void. It was an experiment, and, like all new ventures and experiments, it must necessarily be amended, added to, and subtracted from, in order to get it in good working shape."

Counsel in the instant case say that it is clearly required by the statute (section 323), and they argue, that the permanent school fund is such a sacred trust that the Legislature must be presumed to have deemed it of more consequence than the savings of all the people, and therefore entitled to additional protection during the time any portion of it may be temporarily deposited. Neither answer appeals to us. The first is unsatisfactory, because the conclusion reached by the court that the Legislature, in enacting the bank guaranty law, intended to, and did, provide an adequate system for the protection of the class of depositors entitled to its benefits as a police regulation, uninfluenced by unfounded fears, and by the enactment of section 7943, *supra,* it intended to and did accomplish the same purpose for deposits of any part of the permanent school fund, seems more reasonable and more in harmony with the spirit and the letter of the sections of the statute under consideration, and more nearly to advance the beneficial purposes within the contemplation of the Legislature at the time of their enactment. The second is unsatisfactory for the same reason, and for the further reason that it imputes to the Legislature either a lack of honesty or of intelligence. If it is correct, the liability of the bonding company would not accrue until the banking system of

the state collapsed and every state bank within its borders was in bankruptcy. We cannot conceive such a condition of financial chaos. From our viewpoint, to concur with the latter contention would be tantamount to holding that the Legislature required the state banks in which any of the permanent school fund may be deposited to procure and pay for surety company bonds upon which the surety will never become liable. We are not willing to attribute such folly to the legislative department, when, without violating the canons of construction, it is not necessary to do so.

"Statutes will be construed in the most beneficial way which their language will permit to prevent absurdity, hardship, or injustice, to favor public convenience, and to oppose all prejudice to public interest. 'In construing an act of the General Assembly, such a construction will be placed upon it as will tend to advance the beneficial purposes manifestly within the contemplation of the General Assembly at the time of its passage; and courts will hesitate to place such a construction upon its terms as will lead to manifestly absurd consequences, and impute to the General Assembly total ignorance of the subject with which it undertook to deal.'" (2 Lewis' Sutherland, Stat. Const. [2d Ed.] sec. 490.)

To our minds it is quite clear that the Legislature, in enacting those two sections, had in mind (1) those ordinarily entitled to protection under the police power of the state; and (2) the protection of the permanent school fund. By the first section the state in its sovereign capacity was exerting its power in behalf of its people and their interests, and not in its own behalf, and by the second it dealt with the temporary deposit and protection of the permanent school fund belonging to the state as a sovereign. As a sovereign the state must not be presumed to have exercised its police power in its own behalf to the detriment of its citizens, for whose benefit it is ordinarily exercised, unless the language of the statute itself clearly leads to that conclusion. This power cannot be exercised, except to promote the public convenience, the general prosperity, the public health, the public morals, or the public safety. *C., B. & Q. Ry. Co. v. State of Illinois,* 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175; *C., R. I. & P. Ry. Co. v. State,* 23 Okla. 94, 99 Pac. 901. It must have been obvious that, after the passage of section

7943, *supra,* large sums of the permanent school fund would necessarily be deposited in banks generally, and, in case of the failure of a state bank having such a deposit, payment out of the guaranty fund would place an additional strain upon it that might jeopardize the claims of the people for whose protection it was primarily intended. To obviate this, the Legislature, upon permitting such funds to be deposited in banks, provided a system whereby they would be completely protected against loss without impairing the usefulness of the bank guaranty fund as a police regulation. Moreover, section 7943, *supra,* authorizes the commissioners of the land office to deposit moneys not invested as required by law belonging to the permanent school fund in "such banks or trust companies as they may select," and there is no limitation upon the power of the commissioners as to where they shall make the deposit or the class of banks they shall select. In that respect they have the same freedom as the general depositor. But in the case of the permanent school fund, no matter where the deposit is made, the same class of securities is required. As it is not difficult to think of situations that would make it convenient, if not necessary, to deposit part of the permanent school fund in national banks within the state, or state or national banks outside its borders, it seems but reasonable, in view of such situations, that the Legislature would provide a system of protection amply sufficient to protect the permanent school fund against loss, wherever any part of it might be deposited, without regard to the bank guaranty fund.

Thus this wise provision of the state for protecting its permanent school fund, in case any of the banks wherein any part of it may be temporarily deposited becomes insolvent, will constitute a prop for the guaranty fund, and not a burden upon it. It must be borne in mind that the foregoing sections form a part of the bond herein involved as fully as if specifically made so by its terms. In view of that, and the conclusion we have reached as to their construction, it follows that, with the exception of the first lien of the state upon the assets, etc., of insolvent state banks, created by section 323, *supra,* for the benefit of the depositors' guaranty fund, the rights and liabilities of the surety

company are the same as they would have been if the bond was executed to secure the deposit of a part of the permanent school fund in any bank or trust company within or without the state, not governed by the bank guaranty law.

One of the conditions of the bond is that, in the event of the default on the part of the principal, the surety shall be liable hereunder for only such proportion of the total loss sustained by the obligee as the penalty of this bond shall bear to the total penalty of all bonds and securities furnished to the obligee, and in no event shall the surety be liable hereunder in excess of the penalty of this bond. The manifest purpose of this condition is to make the surety company liable pro rata with all other surety companies securing the same deposit and with all other securities furnished the commissioners of the land office, under section 7943, *supra*. It does not contemplate participation in the guaranty fund by contribution or otherwise. Indeed, the doctrine of contribution or subrogation is not applicable to any phase of this case. The purpose of this proceeding is to compel the Bank Commissioner, acting for the principal, to pay the debt out of the depositors' fund. If this is done, the surety would be discharged and released from liability.

As, under our views of the law, the surety company was not entitled to the relief prayed for and granted by the court below, the cause must be reversed and remanded, with directions to dissolve the injunction and dismiss the petition of the surety company.

Justices WILLIAMS and HAYES being disqualified, Judge STILWELL H. RUSSELL, of the district court of the Eighth district, and Judge C. A. GALBRAITH were appointed by the Governor to sit in their stead.

TURNER, C. J., and GALBRAITH and DUNN, JJ., concur. RUSSELL, J., files a separate opinion, concurring in the conclusion reached and in the reasoning of the court on the principal question involved.

RUSSELL, Special Judge. While agreeing to the conclusion reached by his honor, Justice Kane, in rendering the opin-

ion of the court, in reversing and remanding this cause, we feel constrained to dissent from some features and desire to express our views thereon.

The statement of this case as presented by the pleadings is fully set forth in the opinion of the court. The first question presented: Did the surety company have the right to maintain its position of intervention without having previously paid the penalty of its bond? In answer to this question, we respectfully differ and take issue with the position in the opinion. The defendant in error, being the surety company, bases its right of intervention in this suit upon the allegations of its plea that it was surety in the sum of $50,000 to protect the state of Oklahoma, by reason of a deposit of the school fund in the bank, that it was liable on said bond to the full amount of the penalty, and that the Bank Commissioner had been paying the claims of other depositors in said bank in full, without in any way protecting the said deposit for which it was surety, and that it was the purpose and intent of said Bank Commissioner to pay off other creditors in full, to the exclusion of the said deposit for which it was surety, and that the effect of said payment of other depositors would be to unjustly and wrongfully prefer creditors to the exclusion of the school fund deposit and the detriment of the surety company. In connection with the plea of intervention, they ask that the Bank Commissioner be enjoined from paying out any of the assets remaining in his hands to other creditors or depositors in preference, and the said commissioner be restrained and enjoined from repaying to the banking board the guaranty fund advanced to him, or any part thereof, prior to the paying in full of the deposit secured by the said bond of the said surety company. The decree of the honorable trial court was fully responsive to the prayer of defendant in error.

In aid of the purpose in giving expression to our views upon the question presented, as well as some other features embraced in the case, we desire to state, as succinctly and briefly as possible, what we understand the condition of affairs bringing about the contention at issue. The Legislature of the state of Oklahoma enacted what is commonly known as the "Bank Guaranty Law"

—in other words, a system creating a depositors' guaranty fund. The system was assailed as being unconstitutional, and its legality was sustained, not only by the Supreme Court of this state, in an elaborate and exhaustive opinion by Chief Justice Williams, in the case of *Noble State Bank v. Haskell et al.*, 22 Okla. 48, 97 Pac. 590, but upon appeal to the Supreme Court of the United States, the case was affirmed.   Evidently the purpose of the Legislature was to devise a plan to encourage the people and give proper security for the deposit of their earnings in banks created by that act.   The system of guaranty and assurance put the state banks of Oklahoma between the depositor and possible loss.   This was arranged for by the assessment plan provided for in sections 320 and 323, Comp. Laws 1909.   Under the plan adopted, the Columbia Bank & Trust Company was organized as a state bank, having its assets and deposits, and without restriction as to who should be a depositor, in the sense that such term is generally understood, with the exceptions in the limitations named in the statute.   The Legislature, in its wisdom, had the foresight to make special provision for the safety of the school fund, and to positively inhibit that fund from being placed anywhere without its safety being absolutely guaranteed and protected.   These safeguards are provided for in sections 7942 and 7943, Comp. Laws 1909.   The purpose is evident.   To have permitted a deposit of the school fund without restriction or limitation would have weakened the guaranty fund, and have endangered the safety of the deposits of the people, in whose interest that fund was created.   In effect, the legislation is that the school fund shall not be deposited in any bank without ample security being taken therefor for its absolute redemption in the event of a failure in the place where said fund was placed.   This legislation is clear and unambiguous, and wise and patriotic as well.   No one understood it any better than the defendant in error and all other such investment or security companies.

It seems that $50,000 of the school fund, placed by the commissioners of the land office in the Columbia Bank & Trust Company, was guaranteed by the defendant in error, which would

not have been placed there but for such security, and the surety company, the defendant in error, would not have bound itself in the penalty it did, but for absolute compensation, under its. own terms of compensation. Thus it is a surety for hire. We do not understand from the terms of its bond that it binds itself that, in the event of the state's failure to be reimbursed from other sources, it will only then be liable; but from the terms of the bond it absolutely guarantees the forthcoming of the school fund in the amount of its penalty, and, if default is made, its liability, already liquidated, shall be met promptly. All the conditions of the law imposing liability upon it as a surety for hire, as well as those enacted to safeguard said fund, were not only within the understanding, but the understanding on the part of the defendant in error, as if said terms and conditions had been in words expressed therein. The Columbia Bank & Trust Company failed. The assessment plan was resorted to in an attempt to supply the guaranty fund. Finally the Bank Commissioner made application to the district court for an order authorizing him to sell certain promissory notes, bonds, and other securities, being assets of the bank, upon the ground of necessity to convert said assets in order to pay off the depositors, and requested an order of sale, and such other orders in connection with the administration of the affairs of said bank that may appear from time to time to be necessary and proper, and that the Bank Commissioner, together with any and all creditors and depositors of said bank, be given and awarded by the judge thereof all relief to which they may be entitled. The prayer of the Bank Commissioner seems to have been construed into an admission that the fund for which defendant in error was security is upon the same footing with other deposits. Therefore the defendant in error felt warranted in filing its plea of intervention and asked for the relief granted, as heretofore stated, by the trial court.

In support of the plea of intervention, its attitude in this court is that its liability, if any, does not attach until all the assets of the Columbia Bank & Trust Company and the revenues and resources of all state banks in Oklahoma are exhausted, and

then when these are exhausted there is still a deficiency to provide for the school fund for which they are surety, it would be met by the bond. On this point, this is, in brief, its contention. In our view of the case, the position of the defendant in error is an anomalous one, in this: That if their contention is correct, there is no liability, hence no necessity for a bond, because, with mathematical certainty, it is evident that, if the assets, resources, and revenues provided by the guaranty law are to be resorted to to replace the fund that defendant in error is surety for, this can be supplied, and thereby destroy any possibility of liability. It must be conceded that the defendant in error is a surety for hire, that its obligation is that of a guarantor and indemnitor for hire, and, therefore, what is known and treated and favored by the law as a friendly surety presents a different status than the attitude of defendant in error.

We believe that section 1569, Comp. Laws 1909, furnishes the reason and the rule by which the status of defendant in error is to be determined. Section 1569 declares that:

"The rule of the common law requiring a strict construction of the obligations of a surety shall have no application to the obligations of a surety or guarantor or indemnitor for hire, and all such obligations shall be liberally construed, in accordance with the rules of the general law applicable to policies of insurance."

Guaranty, as defined by the statute (section 3573, Comp. Laws 1909), is "A promise to answer for the debt, default or miscarriage of another person." In section 3583, "A guaranty is to be deemed unconditional, unless its terms import some condition precedent to the liability of the guarantor." And again, in section 3584, "A guarantor of payment or performance is liable to the guarantee immediately upon the default of the principal, and without demand or notice." Referring to section 1569, in the opinion by his honor, Justice Kane, this language is used:

"The statute under consideration prescribes a new rule of construction to guide the courts of this state in construing con-

tracts of suretyship, but does not affect the rights of a surety where there is no ambiguity in the contract."

We are unable to appreciate how the application of section 1569, a plain statutory provision, is to be qualified by the language, "does not affect the rights of a surety where there is no ambiguity in the contract." Either the statute has a direct application to the obligation of a surety or guarantor or indemnitor for hire, when such fact of surety or guarantor or indemnitor for hire is conceded, or should not be considered at all in treating of this question. It unqualifiedly says that the rule of the common law requiring a strict construction of the obligations of a surety, meaning a friendly surety, shall have no application to the obligations of a surety for hire, and, in fear of being misunderstood, it adds:

"But all such obligations [those of a surety for hire] shall be liberally construed, in accordance with the general law applicable to policies of insurance."

If we are to qualify the statute by a construed or patent ambiguity in the contract, and this feature is to control the admitted fact of a surety for hire, then there is no use for the statute, and it can serve no purpose in this case.

The old common-law rule, protecting friendly sureties, and declaring that a surety may compel his principal to perform the obligation when due, and that a surety may maintain an action against his principal to compel him to discharge a liability or debt for which the surety is bound, after the same has become due, has, in our opinion, no such application as will contravene or in any manner impair the unqualified and vigorous application of section 1569 to the attitude of this case. It is declared in section 3584, *supra,* that "a guarantor of payment or performance is liable to the guarantee immediately upon the default of the principal." The defendant in error, in signing the bond, made an undertaking which embraced as clearly the sections of the statute we have quoted as if the same had been in words expressed therein. It said to the state: "We stand sponsor for every dollar named as a penalty in this bond, and we promise to answer for the default as a guarantor of payment, and are liable immediately upon the default." The only two conditions prece-

dent to a prompt payment of the penalty were, first, that there must be a default, and the other, the amount to be ascertained. In the case at bar, both the default and the amount are conceded, and, this being so, the unconditional liability of the defendant in error is clearly established.

For the position of the defendant in error to be consistent, it should have refrained from intervening until it was ascertained that, by the bankruptcy of the state banks on the assessment plan, there was a deficiency for it to pay. From our viewpoint, in order to maintain a plea of intervention, it is presupposed that an interest exists in the subject-matter, or is at least rightfully asserted in the subject-matter of the original suit. The subject-matter of the suit at issue is an attempt to accumulate the assets of a defunct bank, to discharge its preference lien obligations due, in the first place, to the depositors' guaranty fund, and then to the depositors in said bank. The defendant in error has not only failed, but refuses, to pay any of the penalty of the bond, and it seems that it bases its action upon the supposititious theory that there might be something left for it to pay after the state banks and all other sources of revenue had been exhausted, and therefore it claims the right of intervention.

Another view in support of our position against the right of intervention, and as contending for the unqualified application of the statutory provision embraced in section 1569, is presented in the rules of the general law applicable to policies of insurance. Bearing in mind that this defendant in error stands as a surety for hire, an insurer of $50,000 of the school fund placed in a bank by its consent, and then we ask, in the event of a loss, no matter the causes producing that loss, what legal right would this surety company have to dispute the payment of that loss, or to interrupt its payment, more than would an insurance company have to stop the payment of its policy when, from natural causes, a life had been destroyed, or to look to the estate of the deceased for reimbursement after having paid the policy? An insurance company insures a life; it pays the loss upon death being ascertained. If it insures property, it pays the valuation

upon its destruction, and why? Because its contract obligates it to do so.

We quote from the bond in this case:

"The condition of the foregoing obligation is such that, whereas, the said obligee has designated the said principal [the Columbia Bank & Trust Company] as a depository for the funds and moneys that shall come into the possession of the commissioners of the land office of the state of Oklahoma by virtue of the performance of the official duties of the said commissioners of the land office, as provided by the laws of Oklahoma and acts of Congress: Now, therefore, the condition of the above obligation is such that, if the said principal shall, during the term beginning at nine o'clock a. m. on the 18th day of May, 1909, and ending with the close of banking hours on the 17th day of May, 1910, well and faithfully perform the trust reposed in it by such designation, and shall promptly pay all funds and moneys so deposited with it, either on legal order or on check or draft of the commissioners of the land office or the secretary of the commissioners of the land office of the state of Oklahoma, and shall well and truly indemnify the said obligee from any and all losses which it may suffer or sustain during the period as aforesaid, by reason of the designation of said principal as such depository aforesaid, then this obligation to be void; otherwise, to remain in force and virtue."

The seven expressed conditions to the bond in no wise interfere with the contract entered into, and there is no complaint that any of the expressed conditions are pertinent in this case. It is true that the third expressed condition stipulates that:

"In the event of default on the part of the principal, the surety shall be liable hereunder for only such proportion of the total loss sustained by the obligee as the penalty of this bond shall bear to the total penalty of all bonds and securities furnished to the obligee, and in no event shall the surety be liable hereunder in excess of the penalty of this bond."

And to this we say that there is no complaint or plea that there are other sureties for the deposit in question. Therefore this feature needs no further reference, as the amount of the penalty and the default are both conceded.

But back to the question: "Did the surety company have the right to maintain its petition of intervention, without having previously paid the penalty of its bond?" This question is an-

swered in the affirmative in the opinion delivered by his honor, Justice Kane, and inasmuch as, by the terms of the bond, the bank is called the principal, the surety company the surety, and the state of Oklahoma the obligee, this must be the legal relation of the parties in determining their rights and liabilities, and in support of this section 3606, Comp. Laws 1909, is invoked, which says that "a surety may compel his principal to perform the obligations when due," and section 6055, which declares: "A surety may maintain an action against his principal to compel him to discharge the debt or liability for which the surety is bound after the same has become due." We do not dissent from this rule or this equitable principle, but we do contend it has its exceptions in application. This is the rule of *strictissimi juris,* by which the rights of uncompensated sureties are determined; but, when we look to section 1569 of the statute, we find a broader and more liberal construction, and as well a different construction, determining the rights of the insurer and insured in the case of compensated sureties. Under the common law, the rule of *strictissimi juris* applies, without regard to the question whether the surety is a gratuitous one or for hire.

The defendant in error in this case is engaged in the business for profit. In the case of *Hormel & Co. v. American Bonding Co.,* 112 Minn. 288, 128 N. W. 12, 33 L. R. A. (N. S.) 513, where the company executed a guaranty insurance bond to indemnify the respondent against loss from the failure of the principal of the bond to perform his part of a building contract to which he and respondent were parties, it is said:

"While the bond in form resembles a contract of suretyship, it is in fact a contract of insurance, to which the rules of construction peculiar to contracts of suretyship proper do not belong, but to which the rules governing ordinary contracts of insurance are applicable."

In 33 L. R. A. (N. S.) 513, we find in the notes to the opinion, *supra,* this text, and in support of which the author has cited numerous authorities, not only from the Supreme Court of the United States, but the federal courts and Circuit Courts of Appeals and the state courts; and this is the doctrine laid down, viz.:

"The overwhelming weight of authority supports the proposition that the rule of *strictissimi juris,* by which the rights of uncompensated sureties are determined, is not applicable to the contracts of surety companies which make the matter of suretyship a business for profit; that their business is essentially that of insurance; and that, therefore their rights and liabilities under their contracts will be governed by the laws of insurance."

An examination of many of the authorities referred to supports the conclusions of the author. In *American Bonding Co. v. Morrow,* 80 Ark. 49, 96 S. W. 613, 117 Am. St. Rep. 72, it was declared to be now well settled that a bond of a surety company, like any other insurance policy, was to be most strongly construed against the insurer, since its language was that selected and employed by the latter, and, when doubtful or ambiguous, must be given the strongest interpretation against the insurer which it will reasonably bear. In *Carstairs v. American Bonding & T. Co.,* 54 C. C. A. 85, 116 Fed. 449, and 187 U. S. 644, 23 Sup. Ct. 844, 47 L. Ed. 346, in which a writ of *certiorari* was denied, it was declared to be "quite true that the written contracts of indemnity issued by surety companies had come to be looked upon by the courts and to be treated more as policies of insurance than as bonds." The court said:

"As contracts of indemnity, they will be liberally construed, so as to effectuate the purpose for which they were issued, and as, like policies of insurance, they are generally prepared by the bonding company, the rule of *contra proferentem* will often be applied in construing their stipulations."

In *United States Fidelity & Guaranty Co. v. Golden Pressed & Fire Brick Co.,* 191 U. S. 416, 24 Sup. Ct. 142, 48 L. Ed. 242, this language is used:

"The rule of *strictissimi juris* is a stringent one, and is liable at time to work a practical injustice. It is one which ought not to be extended to contracts not within the reason of the rule, particularly when the bond is underwritten by a corporation, which is undertaken for a profit, to insure the obligee against the failure of performance on the part of the principal obligor."

In *Kansas City v. Davidson,* 154 Mo. App. 269, 133 S. W. 365, it was declared that "sureties for hire were not favorites

of the law, entitled to stand upon the strict terms of their obligations, but their status was rather that of insurers, and that their contracts should be reasonably construed to give effect to the protective purposes of their execution." In *Walker v. Holtzclaw,* 57 S. C. 459, 35 S. E. 754, it was held that "while, as a general rule, a surety was a favorite of the law, and his contract should be strictly construed in his favor, such rule had no application where the surety received compensation, and the suretyship was in the line of his regular business." The defendant in error was paid to make this bond, and a plain liability arose on it which ought to be discharged.

Referring again to the contention of the defendant in error, which, to be maintained, would result in no liability whatever for having made the bond, we are yet at a loss to understand how the rule of intervention applies. If there is no liability, then it follows that the surety company had no interest in the subject-matter involved in this case. Upon the other hand, if there is liability, it is a liquidated one, as both the amount and default are conceded. The question is not: Has it the right to intervene if it had paid the penalty, and then, with clean hands, come into court for equitable relief? It comes to court, virtually denying liability, and demanding, without paying a dollar, and without acknowledging liability, the right to stop the Bank Commissioner, operating directly under the laws of the state of Oklahoma, from accumulating and collecting the assets of a defunct principal, which are sought by him to strengthen the guaranty fund to reimburse the depositors in whose interest the law was primarily formed.

In furtherance of this view, we urge that the law was so formed as to induce people generally to deposit their earnings in the state banks. It was an open invitation to them, guaranteeing to them protection by the methods adopted in the act. But how different is the proposition under consideration! The commissioners of the land office were inhibited by positive statute from depositing this school money in that or any other bank unless it first provided against any sort of contingency whereby loss would result. Such deposits made by them were independ-

ent and distinct, and this the defendant in error knew at the time it made the bond, because its obligation is conditioned "as provided by the laws of Oklahoma." As is said by his honor, Justice Kane, in the opinion of the court:

"That the money deposited in the bank by the commissioners of the land office was a deposit in a broad sense is probably true, but it is clear to our minds that the commissioners of the land office are not such depositors, and the funds which the law permits them to deposit in pursuance of their official duties are not such deposits, as fall within the purview of section 323, *supra.*"

This being true, and the deposit not in a class with those in section 323, it but strengthens our position that it was an independent act, made in conformity with the law, which was sanctioned by the defendant in error, and for which it was paid, in response to which it obligated itself to see that $50,000 was reimbursed to the school fund upon default of the principal.

Upon what rule is the right of contribution or subrogation denied in this case, but upon the one we invoke under the authority of section 1569? Gratuitous sureties are favored by the law, and all such, when they pay in default of their principals, in the absence of ability to make their principals first respond, are entitled to contribution and subrogation, and can intervene in all proceedings where the subject-matter in which they are interested is at issue. We recognize this right in its fullest scope; but when we are called upon to assent to the proposition, under the conditions of this record, that a surety can intervene, at least without first paying the penalty it has obligated itself to discharge, we must be permitted to dissent.

The benefit legislation, designed to inspire interest in the state banks and to re-awaken the confidence of the people that a deposit of their earnings would be secure, was not, in our judgment, intended to operate as a shield in the protection of those who, for compensation and hire, would become surety for the safety of a special deposit. The depositors' guaranty fund is created by contributions from the state banks, and the state, in its sovereign capacity, in order to protect the guaranty fund and have the contributors to it to an extent indemnified against unusual assessments, holds a first and preference lien upon

all the assets of said bank and all liabilities against the stockholders, officers, and directors of said bank, and against all other persons, corporations, or firms, and provides that such liabilities may be enforced by the state for the benefit of the depositors' guaranty fund. At the risk of repetition, we insist that this first lien and the purposes for which the lien was created were known by the defendant in error when it guaranteed the deposit in question, and, as insisted by counsel for plaintiff in error, the obligation of the surety company to pay the deposit is subject to this first lien.

If the commissioners of the land office had no right to deposit the school fund without taking security therefor, which they did not, then in such case the contention can be safely maintained that the special deposit in this case would have no claim upon the depositors' guaranty fund, because of its independent and distinctive features. The Columbia Bank & Trust Company, although the principal, is not the beneficiary, of the bond; nor is the penalty of the bond a part of the assets of the bank. The state is the obligee of the bond, for the benefit of the school fund, and therefore the penalty of the bond is an asset of the school fund. The lien held by the state upon the assets of the bank, as we contend, does not apply to this special deposit; it has no relation to it, therefore, leaving the matter as a contract in effect between the commissioners of the land office and the surety company, the defendant in error, which not being complied with, the commissioners of the land office have the right to demand immediate payment of the penalty, the default and amount being conceded.

The commissioners of the land office looked to the solvency of the surety company, as they are required to do by the law, and are not required to investigate the solvency of the place in which the money is to be deposited. This is the duty of the surety company, and in this is conceded the duty of the commissioners to look to it for the payment of the deposit. Banks as depositaries were not relied upon; the depositors' guaranty fund was not looked to, as it is plainly meant by section 7943 that banks and trust companies are to be used as a receptacle for the

deposit only upon the condition that, when not forthcoming the surety or indemnitor for such forthcoming will promptly supply the default. In our view of the law, on the record of the case as presented, the plea of intervention has no standing in this case and should not have been allowed.

If the right of intervention, without having paid the penalty of the bond, is permitted, as is stated affirmatively in the opinion of the court, then it seems to us that this case ought not to be reversed, and why? Because there is involved in the right of intervention the proposition that the school fund deposit is upon a footing with other depositors, and is entitled to a pro rata distribution of the guaranty fund to reimburse such deposit; and if such reimbursement can be had, as provided in the guaranty law, then there is nothing for the defendant in error to pay. The intervention plea is in; in the opinion of the court it has the right there, and, being in, the issues raised by it have to be determined. Its permitted presence is a predetermination of the right to a distribution of that fund. The issues in the case being thus settled, all that is left is to apply the remedy provided by law for the reimbursement of depositors all alike.

The contention of defendant in error, that the resources provided by law shall be exhausted before it is called upon to pay the penalty or any part thereof, follows as a legal sequence to the admitted right of intervention. Intervention conceded carries with it all the other rights granted to it by the honorable trial court, and in the face of such a concession we fail to understand why the judgment of the lower court should not be affirmed. But holding views diametrically opposite to the right of intervention as sought in this case, and to the right of defendant in error to have the resources of the state banks exhausted before liability accrues, compels us to dissent.

We concur in the conclusion reached, that this case should be reversed and remanded; and it is our holding that the plea of intervention should be dismissed, and that the restraining order issued in this case by the honorable trial court be dissolved.